Opinion

per curiam:

This is an action brought by plaintiff contractor for damages alleged to have resulted from defendant’s breach of a construction contract. The case was referred pursuant to rule 45 (a) to W. Ney Evans, a trial commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law to which this court should arrive.
Accordingly, Commissioner Evans has submitted his findings of fact and a recommendation that the court adopt the *320 conclusion as a matter of law that the defendant did in fact breach the subject contract and that as a result thereof plaintiff suffered damage in the amount of $225,000 and is entitled to recover said sum from the United States. The court, after having considered the evidence, the briefs and argument of counsel, agrees that the defendant breached the contract for which it must stand liable.
In his determination as to the amount of damage suffered by the plaintiff, Commissioner Evans based his conclusions upon, “an inference drawn from the evidence as a whole, being in the nature of a jury verdict.” We are of the opinion that the Commissioner was correct in determining damages based upon his judgment arrived at by a studied consideration of the record before him. This court has many times held that the measure of damages is not an exact science calling for a hard and fast rule, but is a determination based upon the facts and circumstances of each case. As we said in Needles v. United States, 101 C. Cls. 535, 618:
* * * The breach is the standard by which the compensation is to be measured, and all that the law requires is that such damages be allowed as, in the judgment of fair men, directly and naturally resulted from the breach of the contract for which the suit is brought.
See also, First-Citizens Bank & Trust Co. v. United States, 110 C. Cls. 280, 326; Chalender v. United States, 127 C. Cls. 557, 566; Houston Ready-Cut House Co. v. United States, 119 C. Cls. 120, 193. On the authority of the principle announced in the above-cited cases we approve the Commissioner’s conclusion that plaintiff was damaged to the extent of $225,000.
The findings of fact and conclusions of law of the Commissioner are hereby adopted and made the basis of the court’s judgment in this case. It follows that plaintiff is entitled to recover of and from the United States the sum of $225,000, and judgment will be entered to that effect.
It is so ordered.
OPINION OE THE COMMISSIONER
The contract in suit covered Earthwork, Stage III, in the construction of Fort Randall Dam, an earth-filled mul *321 tiple purpose dam across the Missouri Kiver in South Dakota, built (under contracts) by the Corps of Engineers of the Army. As initially planned the estimated cost of the project was $200 million, and the anticipated construction period was nine years.
The earthwork was divided into four stages, with a separate contract for each stage. Plaintiff was the successful bidder for each of the four earthwork contracts. Other contractors were responsible for the construction of the concrete portion of the dam, which included the control works.[1]
Plaintiff satisfactorily completed the work on each of its contracts, and on the schedule required by defendant. The present controversy arose out of the scheduling which defendant required for the performance of the Stage III contract.
During the working season of 1949 plaintiff was engaged in the performance of the Stage II contract. This work was completed before the end of the year.
Meanwhile, the Corps of Engineers was preparing the specifications for the Earthwork Stage III contract, which was to include the crucial operations of diverting and closing the river.
Diversion of the river required the completion of the approach and discharge channels, already partially excavated, the removal of four “plugs” (narrow, unexcavated areas, two upstream and two downstream from the control works, retained to keep water away from the control works and to provide access roads and ramps), and the construction of a dike across the normal channel of the river to force the water into the approach channel.
Closure of the river required the construction of a permanent embankment of substantial size (as part of the earth-filled dam) across the old or normal channel of the river.
The flow of the river (its rise and fall) was such that diversion and closure had to be made after the “June rise” and before the ensuing winter months. Once these operations were begun, they had to be completed during the work *322 ing season to secure the dam from the dangers of over-topping by flood waters.
The preparation of the specifications for the Earthwork Stage III contract was begun early in 1949. At that time the Corps of Engineers intended to issue the invitation for bids shortly after July 1, 1949 (representing the beginning of the Government’s fiscal year 1950), to award the contract as soon thereafter as reasonably might be, to require the Stage III work to be begun on or before March 1, 1950, and to require the diversion and closure of the river to be made in 1951.
In this connection the responsible officers of the Corps of Engineers were fully aware of the advantage in bid-position for the Stage III contract accruing to plaintiff by reason of its mobilization of men and equipment on the job-site in the performance of the Stage II contract. Plaintiff was known to them to be a highly competent construction company. There was never any intention of trying to prevent or preclude plaintiff from bidding on the Stage III contract. The concern of the Engineers was to provide conditions that would assure competitive bidding for the work.
The conclusion they reached was that if the invitation for bids was issued and the contract awarded in 1949 at a date early enough to allow the fall and winter months for mobilization, the situation would be as conducive to competitive bids as could reasonably be expected, considering the fact that plaintiff was on the job-site and partially mobilized for the Stage III work.
As the year 1949 wore on, action was delayed in Congress on appropriations for fiscal 1950. By the end of fiscal 1949, the outlook for appropriations sufficient to maintain the planned schedule of Port Eandall construction was unfavorable. The invitation for bids for Stage III was not issued.
Work proceeded, nevertheless, in the drafting of the Stage III specifications, incorporating the original schedule for completion of the contract work in 1951. In August 1949 the draft specifications were assembled in stencil form and distributed to engineers in the field for review and comment.
By this time it had become apparent to the Corps of Engi *323 neers that tibe funds for Fort Eandall construction during fiscal 1950 would probably be less than had been hoped for, and that, in any event, it would no longer be possible to advertise for bids and award a contract early enough in 1949 to assure potential bidders of the fall as well as the winter months for mobilization. Plaintiff’s bid-position advantage would therefore be accentuated unless some further adjustment was made in the scheduling of the work.
The decision was made (firmly, if somewhat reluctantly) to extend the Stage III work over three working seasons instead of two, and to require the diversion and closure of the river to be made in 1952 instead of 1951. Such an adjustment, the Engineers reasoned, would make allowance for the reduced appropriations, and would likewise make possible a later start on the work in 1950, thereby allowing potential bidders the prospect of having the early summer of 1950 within which to mobilize for the work. In other words, the early summer of 1950 would replace the fall of 1949 as compensatory time in offsetting plaintiff’s bid-position advantage.
These decisions and the rationale on which they rested were confined to the level of the District Engineer and higher echelons. They were not communicated, certainly not in any detail, to the Area and Eesident Engineers in the field, and not at all to prospective bidders.
Whan plaintiff completed the performance of the Stage II contract, it elected to hold its equipment at the job-site and wait for the invitation for bids on the Stage III contract. Its Project Manager obtained from the Area Engineer a copy of the draft specifications for Stage III and made preliminary studies of them. He and his father (who was then president of the plaintiff corporation) discussed the specifications in some detail with the Area Engineer, giving particular attention to the work progress inherent in 1951 diversion and closure.
In March 1950 the Engineers issued the invitation for bids for the Earthwork Stage III contract. Many changes in the specifications had been made, reflecting for the most part the kind of refinements that are characteristic of the development of specifications. In addition, however, many dates had *324 been changed, principally by substituting 1952 for 1951. The Corps of Engineers intended, by these changes, to require the diversion and closure of the river to be made in 1952 rather than 1951. The question arising at the threshhold of this case is whether or not the Engineers succeeded, through changes in the specifications, in stating their intention.
Bids were to be opened on May 10, 1950, and work was to be commenced within 30 days after the receipt of notice to proceed. This was defendant’s way of allowing potential bidders the prospect of a reasonable time after the award of the contract within which to mobilize. The Engineers correctly reasoned that, inasmuch as the contractor had until 1952 to make the diversion and closure, he could use at least a reasonable portion of the 1950 working season to mobilize equipment for work during the 1951 and 1952 seasons.
Plaintiff studied the official specifications, noting and comparing all of the changes in dates. Its conclusion was that, whereas any potential bidder could count on not being required to make the diversion and closure until 1952, the language of the contract nevertheless gave the contractor an option to divert and close the river in 1951, if he should elect to do so.[2] Conversations between plaintiff’s Project Manager and defendant’s Area Engineer, while never addressed specifically to the point of the intent of the contract, gave the Project Engineer a strong impression that diversion and closure in 1951 were desired by the Government although not required by the contract.
Plaintiff submitted its bid in contemplation of completing the contract work in two consecutive seasons. Five other bids were submitted. Whether the other bidders all contemplated three-season duration of the work or whether one or more contemplated a two-season job, as did plaintiff, are facts not in evidence. Plaintiff’s bid was the lowest submitted, and the contract was awarded to it.
Shortly after the contract had been signed, plaintiff submitted its work progress schedule and plan of operations, *325 which clearly reflected its plan, for diversion and closure in 1951. Defendant’s Area Engineer forwarded the work plan to the District Engineer with a recommendation that it be approved.[3] On July 6, 1950, more than a month after the plan was submitted, word came from the contracting officer disapproving the plan and insisting on diversion and closure in 1952. This was the first time plaintiff and defendant realized that a difference existed between them in interpreting the specifications.
Plaintiff promptly protested the decision of the contracting officer and noted an appeal to the head of the department. In due course the protest was rejected and the appeal was denied; but by the time the protest was formally rejected, the working season of 1950 was almost over, and by the time the appeal was denied, the contract was nearing its 1952 completion.
After the contracting officer declined to approve plaintiff’s first-filed plan of operations, plaintiff submitted (under protest) a revised plan of operations, providing for diversion and closure of the river in 1952. While the revised plan was pending review by the contracting officer, that official issued his findings of fact on plaintiff’s protest of the initial decision of July 6, 1950. In his findings of fact the contracting officer concluded that the contract was not reasonably susceptible of any interpretation other than that which he had given it in his July 6 decision.
Shortly thereafter, in reviewing plaintiff’s revised plan of operations, the contracting officer noted that although plaintiff had revised its plan so as to effect diversion and closure in 1952, it had retained its original plan to remove the plugs from the approach and discharge channels in 1951. The contracting officer thereupon demanded (and got) a further revision of the plan to postpone the plug removal to 1952. Plaintiff protested this decision, and asked that its protest and appeal be consolidated with its earlier protest and appeal of the July 6 decision.
*326 The contracting officer, however, after six months of discussion and consideration, decided that the postponement of plug removal reflected a change in the specifications, and directed plaintiff to submit a proposal for modifying the contract because of the change.[4]
On the facts as found plaintiff is entitled to recover. The issue of liability is governed by the principle stated in Peter Kiewit & Sons’ Company et al. v. United States, 109 C. Cls. 390 (1947). There the court said (p. 418) :
* * * Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted. Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it. This rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions.[5]
The essential ingredients of the rule are: (1) that the contract specifications were drawn by the Government; (2) that language was used therein which is susceptible of more than one interpretation; (3) that the intention of the parties does not otherwise appear; and (4) that the contractor actually and reasonably construed the specifications in accordance with one of the meanings of which the language was susceptible.
Two of the four ingredients are not in dispute, viz, that the contract in suit was one of those “Government contracts where the contractor has nothing to say as to its provisions”, and that the intention of the parties does not appear except as contained in the contract. The contract was drawn by the Government, and neither party charges it with ambiguity. Each contends that its interpretation was drawn from the plain intendment of the language used.
*327 The two aspects of the Kiewit rule for examination here are whether the language of the contract was susceptible of more than one interpretation and, if so, whether plaintiff actually and reasonably construed it in accordance with one of those interpretations.
The evidence makes it quite clear (1) that defendant intended the specifications to require the diversion and closure of the river to be effected in 1952; (2) that plaintiff read the specifications to mean that, while the work had to be completed ~by 1952, the contractor would be permitted at its option to complete the work in 1951; and (3) that plaintiff submitted its bid in contemplation of a two-season job. None of the facts are better substantiated than these, which summarily dispose of the parties’ contentions wherein each charges the other with afterthought.
The conclusion that the specifications were fairly susceptible of the interpretation placed on them by plaintiff is based on three considerations: (1) plaintiff, a competent contractor of wide experience, read the specifications to mean that by express option, completion in 1951 would be permitted; (2) permission to complete a contract earlier than the date of required completion is usually inherent in Government contracts, unless expressly withheld; and (3) the action of the contracting officer in relation to plaintiff’s claim for postponement of the removal of the plugs was contrary to his (previously expressed) conviction that the contract was reasonably susceptible of no interpretation other than that originally given by him.[6]
Neither the contracting officer nor the appeals board gave consideration to the fact that plaintiff did in fact construe the contract to permit completion in 1951; hence neither of them reached the question as to whether plaintiff’s action was reasonable.
*328 The conclusion that plaintiff acted reasonably in construing the specifications as it did follows, in the narrow sense, from the conclusion that the specifications were fairly susceptible of such an interpretation. In the broader sense, however, the reasonableness of plaintiff’s action involves further considerations: e. g., should plaintiff have sought information from the contracting officer; and should it have disclosed its intention to bid on the basis of completion in 1951?
Plaintiff’s position is that since the language of the contract was not ambiguous, there was no need for interpretation by the contracting officer; and since plaintiff’s bid-position advantage was openly apparent to defendant, plaintiff was under no obligation to emphasize the obvious by disclosing in advance the basis on which it intended to bid.
Plaintiff believed in the validity of these conclusions. It acted upon them in good faith, and without questioning or doubt in the minds of the officers responsible for plaintiff’s course of action.
For all of plaintiff’s good faith the issue of the reasonableness of its action turns on another and finer point. Plaintiff believed that its bid-position advantage was greater by reason of the allowance (as it read the specifications) of the option of 1951 completion than it would have been if (as defendant intended) there had been no such option.[7] Under the circumstances should plaintiff, because of the option (which it believed to be expressed by the contract) have assumed inadvertence on the part of defendant in the resulting enhancement of plaintiff’s bid-position advantage? If so, should plaintiff have made a disclosure to defendant of its intention to submit a bid based on 1951 completion, thereby bringing the inadvertence, if any, to defendant’s attention? Or should plaintiff, for its own protection as a prudent contractor, have made inquiry about the possible inadvertence before bidding?
*329 The writer’s conclusion is that, whereas an inference of duty neglected might be drawn from these circumstances, the inference should not be drawn because the questions raised are so closely related to debatable standards of ethics and business judgment.[8]
Inasmuch as the evidence establishes plaintiff’s ability as well as its intention to perform the contract work in two consecutive seasons, defendant’s refusal to permit it to do so was, under the circumstances, a breach of the contract. Because of this breach, plaintiff is entitled to recover such damages as may appear from competent evidence to have resulted from it.
By the time the contracting officer made his decision of July 6,1950, the working season of that year and plaintiff’s plans for and commitments to it were so far advanced as to leave little or no choice. Accordingly, plaintiff persevered with plans previously made. When the year ended 40 percent of the dollar volume of the contract work had been performed, and plaintiff had assembled (and presumably used) equipment representing approximately 38 percent of the value (according to plaintiff’s valuation) of all of the equipment that was used on the job from beginning to end.
Throughout the working season of 1950, and well into 1951, plaintiff persisted in the belief that the contracting officer could be induced to permit diversion and closure in 1951. He could always alter the time by change order, even if he would not accept plaintiff’s interpretation of the contract. Plaintiff made no substantial move toward bidding on other work for 1951 until sometime in January of that year, and, at the end of April, it still had not passed the point of no return in its efforts to persuade defendant to permit 1951 diversion and closure.
During the working season of 1951 plaintiff performed 26 percent of the dollar volume of the contract work, using a dredge for the larger portion and land equipment for the remainder. Most of the work that was done with land equipment was performed between January 1 and June 30. Dur *330 ing this period plaintiff moved onto the job-site additional land equipment representing approximately the same ratio (in dollar value) to all of the equipment used on the job as the percentage of dollar volume of the contract work performed with land equipment.[9]
At the beginning of 1952 plaintiff had on the job approximately 25 percent (of the value) of all of its land equipment, plus the dredge assembly. Remobilization was begun promptly, and by June 30 the commitment of land equipment had been restored to the same approximate percentage as had been on the job during the 1950 season. During these six months, plaintiff performed only five percent of the dollar volume of the contract work, and the dredge assembly was used for the major portion of that work. The restoration of land equipment represented, for the most part, mobilization for the heavy and rather tight schedule of work to be performed after July 1.
Between July 1 and November 4 (the date of completion) plantiff (1) performed 29 percent of the dollar volume of the contract work and (2) moved 550,890 cubic yards of earth in addition, pursuant to a change order.[10] At the beginning of this period plaintiff had on the job equipment representing 55 percent of the value of all equipment used. Before the period ended other equipment was added, boosting the percentage figure to 60. Sometime between July 1 and December 31 (presumably after October 1), plaintiff moved another 600,000 cubic yards of earth, using equipment already on hand, under its contract for Stage IY.
In the findings an inference has been drawn from the evidence as a whole that plaintiff’s costs of performance, fairly and reasonably incurred, were greater as a result of defendant’s requirement of 1952 diversion and closure than its costs of performance (fairly and reasonably incurred) *331 would have been if it bad been permitted to perform the contract as bid.[11] Similarly, the conclusion was reached that, as a result of defendant’s 1952 requirement, plaintiff’s losses included the profit which it might otherwise reasonably have made on those portions of its organization and equipment that were necessarily detained or retarded in use by plaintiff’s conformity to the changed specifications.[12]
Plaintiff did not undertake to show the difference in costs between the work as-performed and as-bid. Instead, it developed its evidence of damages within the framework of its theory of the case. Defendant concentrated on exposing the weaknesses (inaccuracies and non seqwiturs) of plaintiff’s evidence, and submitted no evidence of its own of the amount of plaintiff’s losses if it should be determined on the facts that plaintiff is entitled as a matter of law to recover.
Plaintiff pleaded alternate causes of action: one based on damages for breach of contract; and one demanding an equitable adjustment. It is plaintiff’s position that the evidence supporting the latter, upon which it concentrated its efforts exclusively, automatically supports the former.
Two phases of this approach warrant separate consideration. One relates to plaintiff’s distinction between the equitable adjustment required by Article 3 of the contract and the equitable adjustment required by paragraph GC-11 of the specifications. The other relates to the distinction between recovery by way of an equitable adjustment (whether the equitable adjustment was required by Article 3, paragraph GC-11, or other provision of the contract), and recovery for breach of contract.
When plaintiff first protested the contracting officer’s decision of July 6,1950, it took the position that, unless the decision was withdrawn or otherwise altered, defendant’s action would constitute either a change in the specifications under Article 3 of the contract or a suspension of the work for the convenience of the Government under paragraph GC-11 of the specifications, and that in either event plaintiff would be entitled to an equitable adjustment covering its increased costs.[13]
*332 In time[14] plaintiff dropped its reference to Article 3 to concentrate its emphasis on paragraph GC-11. The case was tried on the assumption by plaintiff that defendant’s requirement of 1952 diversion and closure constituted a suspension of the work for the convenience of the Government.
The facts do not sustain plaintiff’s contention.
Plaintiff acquired a right to an equitable adjustment, it is true, by virtue of the contracting officer’s decision of July 6, 1950. The right was acquired, however, by operation of law, and not as the result of any overt intention on the part of the contracting officer. His decision was made in good faith and in the belief that the terms of the contract required diversion and closure in 1952 and precluded them in 1951. It was only because he erred, as a matter of law, that plaintiff was right in demanding of him an equitable adjustment. The contracting officer’s lack of intention excludes any suspension of the work as a result of conscious volition.
The equitable adjustment requirement of either Article 3 or of paragraph GC-11 could have become effective by operation of law. That the requirement of Article 3 did so become effective follows necessarily from the conclusions stated in this opinion. That the requirement of paragraph GC-11 likewise so became effective does not necessarily follow from those conclusions, and the facts (that plaintiff had and used relatively a wide area of choice in adjusting to defendant’s requirement) militate against GC-11 while favoring Article 3.
Plaintiff’s preference for the GC-11 provision over that of Article 3 stems from the fact that, for a suspension of work under GC-11 “for an unreasonable length of time causing additional expense or loss,” the contractor is entitled to an equitable adjustment, whereas Article 3 provides for an equitable adjustment without mention of “additional expense or loss” (if changes in the specifications cause an increase in the amount due under the contract or in the time required for its performance).
Plaintiff’s contention is that GC-11, in specifically referring to “additional expense or loss,” is open to and invites an interpretation of a more liberal coverage, in the making *333 of an equitable adjustment than is the case with respect to Article 3.
Logic is against the distinction. No useful purpose would be served by the degrees of equity inherent in the conclusion that whereas Article 3 requires an equitable adjustment, GC-11 requires a more equitable adjustment; or that whereas GC-11 requires an equitable adjustment, Article 3 requires a less equitable adjustment.
By operation of law plaintiff became entitled to an equitable adjustment at the hands of the contracting officer by reason of the contracting officer’s action in making a change in the specifications, as a result of which there was an increase in the time required for the performance of the contract. The refusal of the contracting officer, upon demand by plaintiff, to make an equitable adjustment constituted a breach of contract.
Plaintiff, it has been concluded hereinabove, is entitled to recover for the breach of contract. Plaintiff demands not only recovery for breach of contract but that such recovery shall be in the form of an equitable adjustment. Its position is that since the contracting officer refused to make the equitable adjustment to which it was entitled, the court must now make it for him. In support of this position plaintiff cites a line of decisions by this court wherein the court has said, in effect, and under similar circumstances, that it was making the equitable adjustment to which the contractor was entitled.
In this case, however, plaintiff has made an approach to the amount of damages which the writer is unable to identify as having been previously used.
Instead of offering evidence of damages based on comparative costs (as-performed and as-bid), and instead of producing figures from books kept in the regular course of business,[15] plaintiff restricted its proof to opinion evidence, supplied by two experts. One expert was a consulting engineer who was employed to assemble, determine, and present the elements of plaintiff’s claim.[16] The other was the *334 president of tbe plaintiff corporation.[17] Plaintiff has undertaken, by expert opinion, to inform the court (1) how an equitable adjustment should be made and (2) what the results would be of an equitable adjustment so constructed.[18] The vice in the approach is the vice common to the realm of expert opinion. Such evidence lacks the certainty, and, therefore, the probative value, of evidence accumulated in the regular course of business and subject to audit for accuracy and logic.[19]
The claim plaintiff has presented in this case may not be unrealistic. The burden of proof, however, is on plaintiff. I cannot, on the evidence at hand, find that the claim as presented is realistic. Moreover, the facts do not sustain plaintiff’s contention that the “increased costs” on which it relies were in all respects the necessary and reasonable consequences of defendant’s action. Under the circumstances, determination by inference after the manner of a jury verdict is the only solution available.
When plaintiff bid on the contract in suit, it anticipated a substantially larger profit (percentagewise) than usual. In addition to the bid-position advantage enjoyed by it as a result of partial mobilization, plaintiff believed its competitors in bidding would have to plan either for three seasons of work or for very expensive and difficult mobilization. Plaintiff’s bid was computed accordingly.
Confronted with the necessity of adjusting to defendant’s requirement of diversion and closure in 1952, plaintiff had to elect (1) how much work it should perform during the working season of 1950, (2) how much (if any) it should *335 undertake in 1951, and (3) how much should be reserved for the first half of 1952. The schedule for the second half of 1952 was fixed by the known requirements of diversion and closure.
Plaintiff believed (and reasonably so) that it had little choice in the matter with respect to the working season of 1950. Men, equipment, and organization were already on the job. The plans previously made for that season were therefore carried out.
Adjustments were made in the plans for coordinating land equipment with the dredge assembly for excavation work, with the result that the dredge was used during both 1951 and 1952, and some of the land equipment was withheld.
The planning for adjustments was, however, stopped at this point for several months. The winter and spring, and even the summer, of 1951, found plaintiff with considerably more equipment on the job-site than it had use for. The inference is that it moved onto the job the land equipment it needed for its 1951 schedule, and that all of the carryover from 1950 was surplus. Some of this surplus was no doubt rendered idle as a necessary and reasonable consequence of the adjustment to defendant’s 1952 requirement. By the same token more of it could have been removed than was removed, for employment elsewhere if plaintiff had given the task more attention.
Plaintiff’s election to perform 26 percent of the dollar volume of the contract work during 1951, and the necessity for performing almost 30 percent of the work after July 1, 1952, left only a minor portion of work to be done in 1952 prior to July 1. Plaintiff had nevertheless to mobilize fully, before July 1, for the work to be done after that date.
The evidence supports the inference that plaintiff put more equipment on the job in 1952 than it had need for in the performance of the Stage III contract’s initial requirements. Whether or not this overmobilization was related to the work done under Change Order 4, or under the Stage IV contract, or both, is not established by the evidence.
To the extent, however, that the equipment mobilized during the first half of 1952 was reasonably needed, the idle time made necessary by the division of work between 1951 *336 and 1952 must be regarded as a reasonable consequence of conforming to defendant’s requirement. The same is true of the cost of moving the equipment to the job-site, insofar as such moving represented returns to or replacements at the job-site.
Defendant’s 1952 requirement deprived plaintiff of the fruits of its initial bid-position advantage and caused further costs to accrue by reason of plaintiff’s inability to make efficient use of its equipment.
Other elements of loss have been listed and described in the findings and need not be repeated here. All have been considered in determining the amount of damages.
The determination of damages (finding 39) is based on inference drawn from the evidence as a whole, being in the nature of a jury verdict, and including all losses in one lump sum. The amount of damages so determined is $225,000.
FINDINGS OF FACT
I. The Contract
1. (a) Fort Bandall Dam is a multiple purpose[1] dam across the Missouri Biver in South Dakota. It was built under contracts with the Corps of Engineers of the Army. As the project was initially planned, a construction period of nine years was anticipated, and the cost was estimated at $200 million.
(b) The dam was an earth-fill structure, except for the concrete spillway and control works. Plaintiff [2] was awarded and performed each of the contracts for the four stages of earthwork. The contract in suit was for Earthwork, Stage III.
(c) During the working season[3] of 1949 plaintiff was engaged in the performance of the contract for Earthwork, Stage II. This work was completed during the fall of 1949.
(d) During the working season of 1949 the Corps of Engi *337 neers was engaged in preparing and refining the specifications of the contract to be awarded for Earthwork, Stage III.
2. (a) During the first six or seven months of 1949 the Corps of Engineers contemplated a schedule for Stage III Earthwork which would require the diversion and closure [4] of the river during the summer of 1951.
(b) The draft of the specifications for Stage III was revised in August 1949, and duplicated in ditto or stencil form for distribution to Corps engineers in the field for review and comment by them. As so duplicated the specifications called for the work to begin on or before March 1, 1950, and required diversion and closure of the river during the summer of 1951.
(c) The requirements described in the preceding paragraph were inserted in the specifications in contemplation of advertising for bids during the early weeks or months of the Government’s fiscal year 1950. By the time the specifications were duplicated (as revised in August 1949) the contemplated schedule was under serious question by the responsible, higher echelons of the Corps of Engineers, and was abandoned altogether before the end of 1949.
(d) Modification of the construction schedule theretofore planned became necessary, in the opinion of responsible officers of the Corps of Engineers, because of reductions by Congress in the appropriations for the work on which the schedule had been initially planned. Because of the reduction in appropriations available for fiscal 1950, and because of what the responsible officers considered to be indications of continued lower appropriations, the determination was made by them to substitute a slower schedule of construction; and specifically, to require the diversion and closure *338 of the river by the contractor for Earthwork Stage III during the summer of 1952 instead of 1951.
3. (a) The delay beyond August 1949 in advertising for bids for the Stage III contract presented the Corps of Engineers with complications in assuring competitive bidding.
Adherence to the plan for diversion and closure in 1951 would have required rapid and intensive mobilization of men and equipment by the contractor for the working season of 1950 because of the volume of work necessarily to be completed in 1950 to make 1951 diversion and closure possible.. Such mobilization would be expensive (and perhaps impossible) unless the contractor could have the fall months of 1949 within which to work on it. After August, it was apparent that, by the time a contract could be awarded, the better part of the fall would be past.
(b) In considering the factors described in the preceding paragraph, the responsible officers of the Corps of Engineers were aware of the presence of plaintiff on the jpb-site. They knew that plaintiff could qualify as a potential bidder for the Stage III contract, and that the presence of plaintiff on the job-site in the performance of the contract for Stage II meant that, with men and equipment on hand, plaintiff was already partially mobilized for the Stage III contract.
(c) In modifying the specifications for Stage III to extend over three working seasons instead of two, the Corps of Engineers endeavored to provide a three-season job which, in terms of the contractor’s cost of performance, would be only slightly more expensive than a two-season job would have been if the contract for a two-season job could have been awarded during the early part of fiscal 1950.
4. (a) In August 1949, copies of the Stage III specifications (in draft form, as revised) were forwarded by the Omaha Office to the Area and Resident Engineers at Fort Randall Dam for study and comment.
(b) No formal report was made by the Omaha Office to the engineers in the field (the Area and Resident Engineers at Fort Randall, in particular) of the considerations, deliberations, and decisions described in findings 2 and 3. Such knowledge of these matters as may have been had by the Area and Resident Engineers at Fort Randall was frag *339 mentary and incomplete until the advertisement for bids in March 1950, and may have continued to be so for some time thereafter.
(c) Plaintiff’s Project Manager (on Stage II) obtained a copy of the draft of specifications for Stage III some time after copies came into the hands of the Corps’ Area and Eesident Engineers.
(d) Plaintiff completed the performance of the Stage II contract in the fall of 1949, before severe weather set in, and then elected to hold its equipment at the site and await the invitation for bids on Stage III.
(e) During November and December 1949, plaintiff’s Project Manager and his father, who was chairman of the board of the corporation, discussed the provisions of the draft specifications with the Corps’ Area Engineer. These discussions were in terms of diversion and closure in 1951, as provided by the draft specifications, and related to the details of accomplishing the work, including the capabilities of various types of equipment and the amount that would be needed.[5]
5. On January 19, 1950, the District Engineer reported to a meeting of the Missouri Basin Inter-Agency Committee,[6] in Sioux City, Iowa,[7] that due to the inadequacy of appropriations the completion of Fort Eandall Dam would be delayed one year; that diversion of the river would be made in 1952; and that the over-all structure was, at the time of his report, 23 percent complete.
6. (a) On March 15, 1950, the Omaha Office issued the invitation for bids, to be opened on May 10,1950, for Earthwork, Stage III, the work to be performed in accordance with “Specifications * * * dated 15 March 1950 with Schedules and Drawings listed therein.”
(b) The invitation for bids contained the following provisions :
*340 The right is reserved, as the interest of the Government may require, to reject any and all bids, to waive any informality in bids received, and to accept or reject any or all items of any bid, unless the bidder qualifies such bid by specific limitations.
Bidders should carefully examine the drawings and specifications, visit the site of the work, and fully inform themselves as to all conditions and matters which can in any way affect the work or the cost thereof. Should a bidder find discrepancies in, or omissions from, the drawings, specifications or other documents, or should he be in doubt as to their meaning, he should at once notify the Contracting Officer and obtain clarification prior to submitting any bid.
(c) Any potential bidder could obtain from the Corps of Engineers copies of the contract and specifications, and of most of the drawings.[8] Plaintiff’s Project Manager obtained copies accordingly, and began his study preliminary to the preparation of plaintiff’s bid.
(d) Extensive portions of the provisions of the contract and of the specifications, material to the issues of the case, are set forth in findings 40 through 44.
7. (a) The difference between the draft specifications of August 1949, and the official specifications of March 1950 included one or more changes in each of 71 paragraphs. While the major portion of the changes reflected refinements and clarifications characteristic of the evolution of specification requirements, a dozen or more related to completion dates, and were therefore crucial to interpretation of the contract requirements.[9]
(b) In issuing the formal, official contract specifications, the Corps of Engineers intended to require the diversion and closure of the river to be made after the June rise in 1952.
(c) Plaintiff’s Project Manager (who prepared the bid submitted by plaintiff) understood the official specifications to mean that diversion and closure of the river, although required to be made not later than 1952, would be permitted in 1951 (after the June rise), at the option of the contractor.
*341 8. (a) Upon receipt of the official specifications defendant’s Area and Kesident Engineers understood that diversion and closure were required to be made in 1952.[10] The Area Engineer was nevertheless of the opinion that diversion and closure in 1951 would be advantageous to the Government, and that such operations should be encouraged. He reflected these attitudes in conversations with the representatives of potential bidders, including plaintiff, during the advertising period from March 15 to May 10, 1950.
At this time the Area Engineer was under the impression that the major elements in the decision of the Omaha Office to substitute 1952 for 1951 were (1) the possible extra cost to the contractor of 1951 closing[11] and (2) the necessary adjustment by the Omaha Office to lowered appropriations. He thought that, if these two difficulties could be overcome, it would be advantageous to have the closing in 1951, and that the contract requirements as published could be altered either by addendum before bidding or by change order (assuming the acquiescence of the contractor) after the contract was awarded.
(b) On March 31, 1950, the Area Engineer forwarded to the District Engineer a detailed memorandum on the feasibility of closure in 1951, parts of which follow:
* * * physical performance of requirements for closure in 1951 is considered feasible. The possibility of obtaining bids for closure in 1951 from other contractors, in the face of the contractor on the site, who is practically mobilized for operations in the left abutment at any time, is a situation which may represent a deterrent to bidding by some contractors regardless of whether closure is made in 1951 or 1952. Closure in 1951 will permit the contractor on the site to submit a better price than will be possible for closure in 1952 since *342 it would permit greater use of the equipment that he already has mobilized. It is not believed that he enjoys any bidding advantage with closure in 1951 that he would not have with closure in 1952. * * *
The greater uniformity of operational requirements, before and after diversion, which is essential to closure in 1951, would represent an extremely important and favorable consideration, with respect to job costs in the minds of visiting contractors, based on comments received. The wide difference in production requirements, before and after diversion, which is a feature of closure in 1952, seems to elicit a first criticism by contractors thus far interviewed. Although first consideration would indicate the difference in production rates would be taken care of entirely by additional plant; change to the advanced tempo of production required for closure seems to be considered by them to represent a problem, whereas the lesser flexibility necessary to operational change for closure in 1951 should be much more favorable in this respect
The possibility of lower construction costs for the Stage III Earthwork project, through closure in 1951 if feasible are accepted as indisputable, it is believed, by all concerned. * * * It is further believed that the physical requirements for closure in 1951, as outlined herein, are conclusive as to such feasibility on the basis considered. It is felt that the possibility of insufficient bidders for the project, on the basis of closure in 1951, which has been cited as a basic reason for invitation for bids for closure in 1952 only, may be in error. Based on the analysis herein it is believed entirely feasible to plan for closure in 1951. It is also believed that calling for bids based on closure in 1951 will result in a saving to the Government. It is therefore recommended that an addendum be issued which will require closure in 1951. If satisfactory bids are not received there will still be ample time for readvertising and taking bids for closure in 1952.
(c) On April 6,1950, the District Engineer replied to the foregoing memorandum:[12]
*343 A schedule where diversion and closure are accom- § fished in 1952 rather than in 1951 does not necessarily elay completion of the dam by one year. * * *
* * * a delay of one year in diversion will delay initial power generation by not over eight months and power generation at normal operating head by only about three months. An advantage of increased length of time for spillway and powerhouse construction is provided with the delayed diversion schedule.
The Stage III work is necessarily planned for open competition (The Division Engineer has placed special emphasis regarding this point in the case of this work) and allows for a proper mobilization period by a new contractor. It is not feasible that a new contractor could start full scale operations on or before 1 July 1950. It is believed that logically a new contractor would mobilize only enough equipment and personnel during 1950 to insure his meeting the early completion dates mentioned in the specifications. * * *
It is recognized that a schedule which requires diversion and closure in 1951 would have advantages if the attendant risks could be eliminated, however, the advantages of a proper time allowance for mobilization of plant (particularly a dredge) the improved construction period for spillway and powerhouse, and the elimination of a tight schedule and reduction of risks prior to diversion, all favor the plan for diversion in 1952. It is probable too, that the 1951 and future fund allotments will not support a fast schedule.
(d) The decision of the Omaha Office to require diversion and closure in 1952 had been made long before the foregoing exchange of memoranda. It was based on policy reasons.[13] Closure in 1951 was feasible from the standpoint of engineering.
9. (a) Plaintiff’s Project Manager understood from his conversations with defendant’s Area Engineer during the advertising period that diversion and closure in 1951 were considered by defendant’s representatives to be advantageous *344 to the Government and therefore were desired by it.[14] He also thought that the option (as he read the specifications) for 1951 closing gave plaintiff an advantage over other potential bidders in the competition. It never occurred to him to seek confirmation from defendant’s representatives of his interpretation of the specifications.[15]
(b) On the recommendation of defendant’s Area Engineer a table model of the Fort Randall Dam was built, being constructed of removable parts representing the various phases of construction. On each part a label was pasted showing the year in which that portion of the construction was to be performed. Only the year was shown on the label. No excerpt from or interpretation of the contract was appended. The part representing the closure section was marked “1952” on the top and on the bottom.
(c) On April 13, 1950, defendant’s Eesident Engineer used the table model to explain the sequence of construction operations to a gathering of representatives of prospective bidders. Representatives of plaintiff were present and heard some if not all of the discussions, which included references to 1952 diversion and closure. The Eesident Engineer’s discussion was not directed specifically to the point of 1952 closing as being exclusive of closing in 1951, since he was not aware of any need for such a distinction. Plaintiff’s representatives raised no question because of their Project Manager’s belief that the option for 1951 closing constituted a bidding advantage to plaintiff, which he did not want to disclose to plaintiff’s competitors.
(d) Plaintiff was not advised of the exchange of memo-randa (described in finding 8) between the Area Engineer and the District Engineer. Defendant was not advised of plaintiff’s belief that it possessed an advantage in the *345 competitive bidding, nor was plaintiff advised that defendant likewise believed that plaintiff possessed an advantage in bid-position.[16]
(e) The respective representatives of the parties never realized, before the contract was signed, that their discussions were on separate planes in terms of contract requirements.
10. (a) Plaintiff’s bid was prepared and submitted by plaintiff’s Project Manager (1) in contemplation of performing the work in two seasons instead of three and (2) in the belief that (i) the terms of the contract permitted such performance, at the contractor’s option, and (ii) the presence of the option in the contract gave plaintiff an advantage in bid-position, by reason of plaintiff’s partial mobilization.
(b) In preparing plaintiff’s bid the Project Manager made two sets of computations.
One set represented estimates of the cost to plaintiff of performing the contract, as a two-season job (closure in 1951), with the equipment then on hand (at the job-site, or already owned although located elsewhere) and to be acquired.[17]
The other set of computations represented estimates of the cost to a hypothetical competitor for the performance of a three-season job.
The evidence does not disclose precisely what use was made of these comparative computations in the final summation of plaintiff’s bid. The inference is that on the basis of the comparative data so assembled the unit prices bid by plaintiff were (1) lower than plaintiff believed any potential competitor could reasonably be expected to bid and (2) higher than plaintiff could have bid (with customary allowances for overhead and profit) on the basis of the estimates of the cost to it of performing a two-season job.
11. (a) Six bids were submitted in response to defendant’s invitation, in amounts as follows: $9,247,695; $8,451,- *346 015; $8,425,053; $8,183,870; $7,968,200; and $7,208,896 (bid by plaintiff).[18]
(b) The Government’s prebid estimate of the reasonable cost[19] of the work (without profit), extending over three working seasons, was $6,854,849.[20]
(c) The evidence does not disclose the basis (two-season or three-season work) of any bid submitted other than that of plaintiff.[21]
(d) Three of the bids provided that they were conditioned upon award of all items bid.[22] Plaintiff’s bid was not so qualified.
12. While the evidence is incomplete as to the bases of the bids submitted by others, the following conclusions are warranted by the evidence as a whole in relation to the foundation, conduct, and nature of the competition:
(1) That an advantage in bid-position inured to plaintiff by reason of the presence on the job-site of the equipment used by it in the performance of the Stage II contract;
(2) That this advantage inured as against all other bidders;[23]
(3) That the potential of plaintiff’s advantage was greater in relation to a two-season job than in relation to a job extending over three seasons;
(4) That the essential facts pertaining to plaintiff’s bid-position advantage and its potentials were known to and were considered by the officers of the Corps of Engineers who were responsible for issuing the invitation for bids;
*347 (5) That these officers, in changing the specifications in such manner (according to their intention and belief) as to require a three-season job, thought they had so reduced plaintiff’s inherent bid-position advantage as to assure competitive bidding in keeping with customary standards; and
(6) That the submission of five bids in addition to that of plaintiff attests to the soundness of the officers’ judgment in respect to the matter.
13. The award was duly made to plaintiff as the lowest bidder,[24] and the formal contract[25] was executed under date of May 16,1950. By its terms plaintiff undertook to “* * * perform all work required for Earthwork, Stage III, for Fort Bandall Dam * * * for the consideration as listed in the * * * ‘Schedule of Unit Prices’ * * * in strict accordance with the * * * ‘Specifications * * *’ dated 15 March 1950 * * *” and Addenda Nos. 1, 2, and 3, the work to be commenced within 30 days after receipt of notice to proceed and to be “* * * completed and ready for use within the time specified in paragraph SC-1 of the specifications.”[26]
14. (a) The Corps of Engineers (including the Division and District Engineers) intended the official specifications to require that diversion and closure of the river should be made in 1952.
(b) The official contract specifications of March 1950 were derived from the initial, draft specifications of August 1949.
(c) The changes actually made (to transform the draft specifications into the official text) failed to state, unequivocally, the intention to require diversion and closure in 1952.
(d) The language of the official specifications was reasonably susceptible of being interpreted to mean that diversion and closure, although required to be made not later than 1952, could be made in 1951, at the contractor’s option.
(e) Plaintiff understood the specifications to contain the option described in the preceding subparagraph, and based its bid on that understanding.
*348 (f) Under all of the circumstances of the case plaintiff’s action as described in the preceding subparagraph was reasonable.[27]
II. Performance
15. (a) The principal features of the work to be performed under the contract consisted of (1) clearing and grubbing; (2) excavating the approach and discharge channels; (3) completion of rolled embankment on the left abutment; [28] (4) placing a portion of the right bank abutment; (5) diversion of the river; (6) closure of the river; and (7) placing an additional portion of the right bank abutment.[29]
(b) When the contract in suit was made, three other contractors were at work on the concrete portion of the dam, which included the intake, outlet, and control works. One contract covered the intake structure on the upstream face of the concrete dam in what was designated as Area B. A second contract was for the powerhouse substructure and stilling basin on the downstream face of the concrete dam in what was designated as Area J. The third contract related to the tunnels through the dam.
(c) Area B (immediately upstream from the control works) had been excavated to a depth of 30 feet below the normal channel of the river. The contract specifications required plaintiff to maintain the access roads to Area B and to keep the area unwatered until July 1,1951.
The upstream boundary of Area B was marked by a natural dike (unexcavated earth) on which was an access road from which ramps ran down the side of the dike (described in the specifications as Plug No. 3) to provide access to Area B in general.
Upstream from Plug No. 3 another dike (Plug No. 4) crossed the approach channel and prevented the entry into the channel of water from the river. The section of the approach channel between Plugs 4 and 3 had also been excavated to a depth somewhat below the level of the river.
*349 Plaintiff was required by its contract to remove both of these plugs and to perform additional excavation in the approach channel.
(d) Area J (immediately downstream from the control works) led to the discharge channel. The downstream boundary of Area J was marked by another natural dike on which an access road fed into ramps leading to Area J. This was Plug No. 1. Downstream from it was Plug No. 2, across the discharge channel. Plaintiff was required by its contract (1) to maintain access to Area J until July 1,1951, and (2) to remove Plugs 1 and 2 and to perform additional excavation in the discharge channel.
(e) The specifications estimated the completion dates: (1) of the tunnels as 1 February 1951; (2) of the powerhouse and stilling basin as 1 July 1951; and (3) of the intake structure as “1 January 1952 with scheduled completion of all work ready to receive the flow of the river 1 June 1951.” [30]
(f) Diversion was to be accomplished by constructing a dike across the normal channel of the river, forcing the flow into the approach channel, whence it would go through the intake into the outlet works and the discharge channel, thence back to the natural channel of the river downstream from the dam.
(g) Following diversion, closure was to be made by placing earth-fill across the normal channel of the river downstream from the diversion dike. This operation encompassed earth-moving of extensive proportions within a relatively short period of time to protect the structure from overtopping.
16. (a) Immediately after the contract was signed, plaintiff’s representatives discussed with defendant’s Area Engineer the plan of operations they were incorporating in the progress schedule to be filed in conformity with the requirements of the specifications.[31] The Area Engineer knew that plaintiff’s representatives were contemplating a construction program under which diversion and closure would be made in 1951.. He said nothing, however, about the contract’s requiring closure in 1952, because he assumed that plaintiff *350 intended by its progress schedule to ask for a modification of the contract to permit the 1951 closing.[32]
(b) The plan of operations was completed within a week after the signing of the contract and was dated May 24, 1950.[33] Plaintiff formally submitted it to the Area Engineer by letter dated June 1,1950. Plaintiff’s intention to divert and close the river (and to complete the contract work) in 1951 was evident from this bar-chart plan of operations.[34]
(c) Notice to proceed was issued on June 12, 1950, and was received by plaintiff the next day.[35] Work was promptly begun by plaintiff, in conformity with its plan of operations.
(d) On June 13, 1950, the day work was begun, plaintiff had on the job-site 196 pieces of equipment.[36] According to valuation methods used by plaintiff in presenting this claim,[37] the equipment on hand on June 13, 1950, repre *351 sented 86.35 percent of the value of all of the equipment used on the job from beginning to end.[38]
17. (a) On June 14, 1950, the Area Engineer forwarded to the District Engineer the following memorandum:
Transmitted herewith * * * is * * * progress chart for Stage III Earthwork, as prepared by the contractor and submitted for approval in accordance with requirements of the specifications. Also inclosed is * * * the contractor’s proposed plan of operations.
Of special note, is the contractor’s intent to perform diversion and closure operations in 1951 in lieu of 1952 as provided by the contract. Based on the inclosed plan of operations and the equipment proposed for use, it is the opinion of this office that closure in 1951 is practicable, * * *
* * * this office recommends that the inclosed progress schedule be approved, provided financing of the accelerated schedule can be arranged. * * *
(b) On June 28, 1950, the District Engineer replied:
* * * careful study has been made of the contractor’s work schedule with particular reference to the proposal to divert the river in 1951. The advanced state of equipment mobilization, the ample equipment proposed and the contractor’s past record of better than scheduled performance all indicate that the work to be done with land equipment can be performed in accordance with the proposed schedule. It is noted however that the schedule provides for dredging the approach and discharge channels between 1 April and 15 July 1951; this proposal is believed to contain several elements of risk. * * * the risk is not entirely eliminated even if it can be assured that the dredge is ready to operate on 1 April 1951. * * * The schedule for the critical dredging operation should be very conservative.
If diversion in 1951 were permitted some advantages to the Government would occur,* * * To gain these advantages the annual appropriations for 1951, 1952, *352 and 1953 would need to be $5,000,000 greater on the average than required to support the present schedule based on diversion in 1952. Kecent directives from the Office, Chief of Engineers require that requests for funds be the minimum required to support economical progress.
In addition * * * several serious engineering disadvantages occur in a schedule based on diversion in 1951 * * *
* * * Gates should be installed in the dry if at all feasible * * * The Schedule A contractor is not required to complete installation of the gates until 1 January 1952. Diversion in 1951 therefore entails risks which are no longer warranted.
* * * it is necessary that some penstock installation * * * take place during the summer and fall of 1951. * * * Diversion in 1951 would seriously impede pen-stock work in 1951 * * * diversion in 1951 could delay rather than expedite the over-all construction progress. With diversion in 1952, not only can a few penstocks be installed in the dry but considerable work on the powerhouse superstructure can be accomplished in 1951 without the hazards of working over the water.
* * * the silt accumulation * * * would be increased by 1951 diversion. * * *
* * * before the pool is raised, considerable sand may be carried by the water and some erosion will no doubt occur.* * * The risk of damage is proportional to the duration of flow through the conduits so it is desirable to minimize the period of possible damage by closure in 1952.
# jft ífc jJ: #
On the basis of the considerations outlined herein, the contractor’s plan should be returned without approval. * * * the contractor should be requested to submit a plan based on 1952 closure in accordance with the specifications.
(c) On July 6,1950, the Area Engineer wrote to plaintiff:
In accordance with instructions from the District En-Sineer, your progress schedule and plan of operations for tage III Earthwork, based on 1951 closure, are returned herewith, disapproved.
Information received indicates that the proposed schedule, as submitted, is not compatible with the schedule for other features of dam construction or with projected plans for construction financing. Accordingly it *353 is requested that you submit a plan based on 1952 closure, in accordance with the specifications.[39]
(d) The foregoing letter was, on the day of its date, adopted by the District Engineer as the decision of the contracting officer, and plaintiff was so advised.
18. (a) On July 17, 1950, by letter addressed to the District Engineer, plaintiff protested the contracting officer’s decision of July 6, 1950, disapproving the first-filed plan of operations, and appealed to the head of the department. The letter contained the following:
The 4th paragraph of our bid provides that we would fully complete the work ready for use not later than the time fixed for completion by the specifications.
Paragraph 5 of the invitation for bids provides that should there be any doubt as to the meaning of the specifications that the bidder should obtain clarification from the Contracting Officer prior to submitting his bid. From prebidding information we received, it would be optional for the contractor to make the closure after July 1951 * * * We computed our costs and lowered our bid price on the basis of diverting the river in 1951. If we are not permitted to complete the contract in accordance with our schedule submitted June 1, 1950, we will incur heavy losses of several hundred thousand dollars in added overhead expense, idle plant, and from commitments we have made on a special 30" diesel-electric dredge which is required for the 1951 closure.
If, pending decision on this protest and appeal, we are to submit a new schedule as directed by the Area Engineer’s letter of the 6th, it will, of course, be under protest for the reasons herein stated. May we have your immediate decision on our protest and specific written instructions.
Kindly transmit this letter through channels as our appeal to the Head of the Department.
(b) On July 31,1950, the Area Engineer wrote to plaintiff:
In accordance with your letter of 17 July 1950 and the agreement reached at our conference on 31 July 1950, *354 please submit a revised progress schedule based on 1952 closure for the approval of the Contracting Officer. * * *
(c) On August 12, 1950, plaintiff replied:
* * * the agreement reached at the conference on July 31, 1950 * * * consisted entirely of a verbal request from you * * * that we submit a revised progress schedule * * * and [our] reply to you that we would do that. * * *
We understand your letter of July 31? to be the written instructions we requested and that decision on our protest and appeal is still pending. We are therefore working on a revised progress schedule as requested and will submit it to you just as soon as it is completed, with the understanding that we are doing so under protest * * *.
19. (a) On August 28, 1950, by letter addressed to the Area Engineer, plaintiff submitted a revised plan of operations, based on 1952 closing. The letter noted that—
* * * this revised schedule is presented under protest pending the decision of the Head of the Department regarding our protest and appeal the order disapproving the original progress schedule and plan of operation.
(b) The revised (second-filed) plan of operations recorded extensive excavation and earth-moving accomplished during June, July, and August 1950, and projected continuation in September, and additional, rather extensive operations in October and November 1950. All of this work was shown as having been or to be performed with “land” equipment.
For the working season of 1951, the schedule and plan indicated relatively minor work with land equipment during April and again in July, with the dredge scheduled for fairly extensive work during May, June, July, and August.
The full schedule of operations was to be resumed in April 1952, to continue through May and June. After diversion in July, the schedule for closure during August through November was almost identical with the schedule on the first-filed plan of operations for the same months in 1951.
20. (a) On August 30, 1950, the contracting officer forwarded to plaintiff his findings of fact “* * * pursuant to the appeal of * * * the contractor from the decision of the *355 contracting officer disapproving * * * plan of operations based on diversion and closure in 1951.” The letter invited plaintiff’s “written response” to the findings, and also requested “opportunity of a personal discussion * * * prior to forwarding the file to higher authority for decision * *
(b) The contracting officer’s findings of fact noted the contentions of the Government and of the contractor, summarized several provisions of the contract, concluded that the language of the specifications, left no “room for doubt as to the fact that diversion” was “scheduled for 1952,” and recommended that the “contractor’s appeal not be sustained.”
(c) Plaintiff’s response to the contracting officer’s findings of fact noted that the personal discussion requested by the District Engineer had been held;[40] protested “the contention of the Government that diversion and closure in 1951” was “not compatible with other features of the dam construction and that the specifications provide for diversion and closure only in 1952;” reiterated the contractor’s contention that “so far as is disclosed by the specifications, diversion and closure was permissible during the summer seasons of either 1951 or 1952;” analyzed the contract provisions on which the contracting officer appeared to plaintiff to have relied; challenged the logic and soundness of the contracting officer’s conclusion; and protested his recommendation. The “Conclusion” of plaintiff’s response follows:
As a result of the conference * * * with the Contracting Officer * * * we were advised that there were certain reasons considered adequate by the Engineers which had developed which required that the work not be completed until 1952. If such reasons are adequate we do not question them, as that is not our province, as far as reasons may be necessary to justify the Contracting Officer in changing the specifications under Article 3 of the contract, or in requiring the contractor to suspend work during the 1951 season under Par. GC-11 of the specifications for the convenience of the Gov *356 ernment. We do object to the failure of the Government to comply with the provisions of Article 3 and Par. GC-11 requiring the making of an equitable adjustment in our contract price. We want to cooperate and are perfectly willing to comply with all orders and requirements of the Contracting Officer, but we do request that the Contracting Officer comply with the provisions of the Contract documents which provide for the making of equitable adjustments in connection therewith.
* * * we respectfully request that the Contracting Officer * * * reconsider * * * and that the relief requested by the Contractor be granted.
We further request that in the event such relief is denied by the Contracting Officer, that this Response and Protest be considered as a supplement to our Appeal and that it be forwarded to the Head of the Department for consideration in connection with our Appeal.[41]
21. (a) On September 28, 1950, the Area Engineer returned to plaintiff the second-filed plan of operations with a letter stating that (after review by the contracting officer) : “* * * although completion of many of the items is still much earlier than required by the specifications, the revised schedule is considered substantially satisfactory.” The letter continued:
* * * The * * * plan of operations * * * show the protecting chalk plugs for the outlet works, * * * to be removed during July 1951. Under present plans this procedure would interfere with future construction to be accomplished in the outlet work area, prior to diversion, and therefore is not acceptable.
It is requested that the * * * plan of operations be revised * * * to conform with the above requirements * * *
The protective plugs should not be removed earlier than necessary to meet actual physical requirements for diversion in 1952.
A detailed plan for diversion will be required in accordance with the requirements of 5-03c which will be supplemental to this progress chart and plan of op *357 erations. The detailed plan for diversion should be submitted separately.
(b) On October 28, 1950, plaintiff replied. After citing provisions in the specifications on which it had relied as authorizing removal of the plugs in 1951, the letter noted that “we understand from * * * your letter * * * that we are now prohibited from removing these plugs until 1952,” and then continued:
* * * If this requirement is a part of the change in the specifications effected by the disapproval of our original progress chart and plan of operations for diversion and closure in 1951 and the requirement that we submit a revised chart and plan showing diversion and closure in 1952 now involved in our pending appeal of 17 July 1950, then this requirement confirms the correctness of our position taken in connection with the appeal, and the additional cost to us occasioned thereby should be included in the equitable adjustment that we are entitled to on account of such change.
On the other hand, if this requirement is not a part of the change involved in our pending appeal of 17 July 1950, then it is a new and additional change in the Specifications which we hereby protest and claim an equitable adjustment to cover our increased costs and additional time occasioned thereby.
H« H* ❖ ❖ sfc
We are revising our revised progress schedule as requested and will submit it to you at an early date, but with the understanding that we are doing so under protest and reserving our right to an equitable adjustment to cover our increased costs on account thereof and for an extension of time.
Please submit this protest through channels to the Contracting Officer. We request his decision as to whether this requirement is a part of the prior requirement that we submit a Revised Chart and Plan showing a 1952 diversion and closure and now covered by our pending appeal dated 17 July 1950, or whether it is a new and further requirement subject to a new and separate appeal. If it is such a new and further requirement, then in order to be sure that we have preserved our rights, we hereby appeal to the Head of the Department from your ruling of 28 September 1950 that the protective plugs not be removed earlier than necessary to meet actual physical requirements for diversion in 1952.
*358 (c) On October 25, 1950, plaintiff forwarded to the District Engineer a “supplement” to the response it had made (finding 20) to the contracting officer’s findings of fact. After citing further provisions of the specifications in support of its contention that 1951 closure was permissible, the letter then turned again to the chalk plugs :
The above quoted provisions of the Specifications clearly indicate that the removal of the chalk plugs preparatory to diversion could be performed at any time after 1 July 1951. Since these chalk plugs were to protect the intake structure and the outlet works from flooding due to high river stages, it would appear that this date would have been specified as 1 July 1952 instead of 1 July 1951 if diversion was not to be until 1952. _
_ This now appears to be confirmed by the Area Engineer’s letter to us of 28 September 1950 in connection with our revised progress chart and plan of operations based on 1952 closure which we submitted as requested but under protest. The Area Engineer in his letter of 28 September 1950 requested that we revise our revised progress chart and plans of operations to conform to the following requirement, among others:
“C. The protective plugs should not be removed earlier than necessary to meet actual physical requirements for diversion in 1952.”
We submit that the above quoted requirement of the Area Engineer is a change in the Specifications made necessary because of tide previous change in the Specifications from a permissible 1951 diversion and closure to a required 1952 diversion and closure.
(d) Plaintiff had planned, as indicated by both its first-filed plan of operations and the first revision thereof, to remove Plugs 1 and 8 during the summer of 1951 as part of its plans for dredging the approach and discharge channels between April 1 and July 15." The specifications required these plugs to be maintained in place until July 1, 1951, but further stated that the intake structure would be “ready to receive the flow of the river 1 June 1951.”[42]
22. (a) During the working season of 1950, plaintiff completed 40 percent of the dollar volume of the contract work. This performance represented a close approximation of the *359 progress schedule of the first-filed plan of operations. In performing this work plaintiff used land equipment representing 38.31 percent of the value of all equipment used on the job from beginning to end.
(b) In conformity with plans worked out prior to the award of the contract, arrangements were made by plaintiff, beginning soon after the award, to procure a dredge for use in a considerable volume of the excavation, and to coordinate the use of land equipment with the capacity of the dredge.[43]
(c) By the time plaintiff received the contracting officer’s decision of July 6,1950, the working season of that year was so far advanced, as were plaintiff’s plans for and commitment of equipment on the job, as to deprive plaintiff of any reasonable choice as to the volume of work to be dispatched during the 1950 working season. Plaintiff’s election to persevere with the schedule it had set for itself during that season was therefore reasonable, and the use made by it during that season of the equipment it had committed to the job was reasonably efficient.
23. (a) On December 8, 1950, plaintiff forwarded to the Area Engineer a “revision of the revised progress schedule and plan of operations” (being the third-filed plan). The forwarding letter said:
* * * This progress schedule and plan of operation is being submitted under protest and. we reserve a right to an equitable adjustment to cover an increased cost on account thereof and for an extension of time.
(b) On January 2, 1951, the Area Engineer wrote plaintiff:
The progress curve together with the revised plan of operations * * * have been approved by the (Contracting Officer.
Approval of the progress curve and plan of operations does not waive the requirements for the submission of a detailed plan for diversion and closure * * *
*360 24. (a) On January 4, 1951, plaintiff wrote to the District Engineer:
Our work under this contract is now approximately 48% completed. Under the Devised Schedule which we filed under protest, we will have very little work to perform during 1951, and consequently the major portion of our plant and equipment on the site will be idle. If our appeal be sustained, we will have a claim against the Government for our increased costs involved, which will include among other items rental on this idle equipment.
It is our desire to endeavor to mitigate this loss on this idle equipment by endeavoring to use this equipment on other work during the 1951 season. We believe that it is to the best interests of both the Government and the contractor that we endeavor to do this. We therefore intend to bid on new work for 1951 and in that manner attempt to obtain work for such of this equipment as we are able to do so during 1951.
Please advise us promptly as to whether or not any change is contemplated in the present plan of operation which would necessitate the use of this plant and equipment on the work during 1951, and whether or not you have any objection to our removal of such plant and equipment now on the site that we will have no use for on this work during 1951 but for which we may be able to obtain work therefor elsewhere during 1951. * * *
(b) On January 8, 1951, the District Engineer replied:
There is no change in the plan for diversion in 1952.
This office will not object to the removal of any plant and equipment not required to maintain your schedule * * *
25. (a) After six months of consideration by the contracting officer of plaintiff’s position with respect to removal of the plugs, plaintiff was advised by the Acting Area Engineer’s letter of May 8,1951:
In accordance with agreements reached at conference with the District Engineer, 30 April 1951, relative to removal of chalk plugs protecting outlet works in 1952 in lieu of 1951, under revised progress schedule, it is understood that plug removal is to be considered separate from and in no way connected to other claims based on 1952 closure as contained in your letter dated 23 October 1950 * * *
*361 It is requested that you submit a proposal for contract modification for the removal of protective plugs in the 1952 working season in lieu of 1951.
(b) Sometime during the same month [44] plaintiff replied:
You state that it is understood that plug removal is to be considered separate from and in no way connected to other claims based on 1952 closure as contained in our letter dated 23 October 1950. We have been giving this matter further consideration and it appears to us that the plug removal is definitely connected with our other claims based on 1952 closure. * * *
We therefore request that our claim for an equitable adjustment in our contract price to cover our increased costs occasioned by your order suspending the removal of the chalk plugs protecting the outlet works be con-considered in connection with and as an addition to our claim for an equitable adjustment in our contract price to cover our increased costs occasioned by your order suspending the diversion and closure from 1951 to 1952.[45]
(c) Plaintiff postponed the removal of the plugs until 1952, when they were removed in May and June, prior to diversion of the river in July. No proposal for contract modification because of the postponement was submitted by plaintiff, and none was made by defendant.
26. (a) During the working season of 1951, plaintiff performed 26 percent of the dollar volume of the contract work: 15 percent during the first six months, with land equipment predominating, and 11 percent during the second six months, using the dredge almost exclusively.
(b) At the beginning of 1951 plaintiff had on the job 225 pieces of land equipment representing 38.01 percent of the value of all equipment used on the job from beginning to end.[46] During the first six months of 1951 plaintiff moved onto the job 35 additional pieces of land equipment [47] and removed 57 pieces,[48] for a net deduction of 22 *362 pieces. For the period as a whole the average of land equipment on'the job represented 34.08 percent of the value of all equipment used on the job from beginning to end.[49]
(c) During the first six months of 1951 plaintiff had on the job considerably more land equipment than it needed to accomplish its performance of 15 percent of the dollar volume of the contract work.
(d) As of July 1,1951, plaintiff had on the job 203 pieces of land equipment and the dredge (with barge and tug). Altogether, this equipment accounted for 47.11 percent of the value of all equipment used on the job (30.15 percent for land equipment; 16.96 percent for the dredge assembly). Between July 1 and December 31,1951, plaintiff moved onto the job four additional pieces of land equipment and removed 127 pieces, to close the year with 80 pieces of land equipment representing 8.02 percent of the value of all equipment used. For the period the average of land equipment on hand was 141 pieces, representing 19.08 percent of the value of all equipment used.
"(e) Except for a minor volume of work performed in July 1951 with land equipment, plaintiff used the dredge assembly to perform the 11 percent of the dollar volume of the contract work that was accomplished between July 1 and December 31, 1951. It had no use for the land equipment in the contract' work after July.
(f) It is not established by the evidence that plaintiff was deprived of reasonable choice as to the use to be made during 1951 of land equipment[50] by either (1) the situation created by the contracting officer’s decision of July 6,1950,[51] or (2) the necessity of proceeding with the work as previously scheduled during the 1950 season.
*363 (g) The evidence as a whole warrants the following inferences: (1) that plaintiff continued to believe, throughout the working season of 1950, that the contracting officer could be induced to permit diversion and closure in 1951;[52] (2) that, because of this belief, plaintiff deliberately refrained from passing the point of no return on the possibility of 1951 completion until May 1951; and (3) that by the time plaintiff seriously came to grips with the necessity for arranging for the use during 1951 of equipment that would otherwise be idle, a substantial part of the season of best opportunities for making such arrangements had already passed.
27. (a) During the working season of 1952 plaintiff performed 34 percent of the dollar volume of the contract work, being five percent during the first six months, and 29 percent between July 1 and the date of completion (November 4).
(b) At the beginning of 1952 plaintiff had on the job 80 pieces of land equipment and the dredge assembly, representing 24.99 percent of the value of all equipment used on the job. By June 30, 1952, plaintiff had moved in 79 additional pieces and had removed 15, for a net commitment at the end of the first six months of 144 pieces of land equipment. These pieces plus the dredge assembly represented 55.38 percent of the value of all equipment used on the job.
(c) During the working months of April, May, and June 1952, plaintiff had on hand much more equipment than could have been needed or used in its performance during that time of five percent of the dollar volume of the contract work. The inference is that most of plaintiff’s commitments of equipment during the first six months of 1952 represented make-ready for the heavy and tight schedule of work to be performed after July 1.
(d) Counting the addition of 29 pieces and the removal of 14 between July 1 and November 4 (the completion date), plaintiff had on hand for the final phase of the work equipment representing approximately 60 percent of the value of all equipment used on the job.
*364 (e) The river was diverted during July 1952, following the removal of the plugs in May and June. Closure was begun in August and continued into November.[53]
(f) In connection with the closure defendant issued a change order (No. 4) pursuant to which plaintiff, using equipment on hand, removed an additional 550,890 cubic yards of earth. Further details of the change order are not in evidence.
(g) The contract for Earthwork Stage IV was awarded to plaintiff sometime during 1952, and before the year ended plaintiff moved 600,000 cubic yards of earth pursuant to that contract, using the same equipment that had been used for the Stage III contract.
(h) No details are in evidence relating to the planning by plaintiff for the performance of the extra work required by Change Order 4 or of the Stage IV contract work.[54]
(i) It is not established by the evidence that plaintiff used in or needed for the performance of Stage III contract work (excluding Change Order 4) all of the equipment it had on hand during the July 1 to November 4 period.
28. (a) Plaintiff’s “* * * appeal * * * from the decision of the contracting officer disallowing a claim for additional expense incurred * * * by reason of refusal * * * to permit diversion * * * during 1951”[55] was heard by the Corps of Engineers Claims and Appeal Board on May 28,1952.
(b) The Board’s decision was made on August 15, 1952. Plaintiff’s appeal was denied. The scope of the claims heard and determined by the Board is indicated by the following excerpt from the decision:
On 24 May 1950, the contractor submitted a proposed schedule of operations indicating diversion in 1951. The Government, on 6 July 1950, disapproved the proposed plan of operations, objecting to the time of *365 diversion, and required the contractor to submit a progress schedule providing for diversion in 1952. It is from that decision of the contracting officer of 6 July 1950 that this appeal was taken 17 July 1950.
(c) The essence of the reasoning in the Board’s decision is reflected by the following excerpts:
* * * While the Government may have intended diversion in 1952, the rights of the parties under the agreement are for determination from the terms of the agreement itself, and the desires of the Government, if not clearly stated, would not be controlling. It is, therefore, necessary that the provisions of the contract be carefully examined to determine whether the Government expressed that intent.
* * * Paragraph 1-02 * * * provides that the contractor shall perform the operations described in the following paragraphs “and all other earthwork operations incidental thereto, in accordance with a schedule of operations which will insure diversion of the river and closure of the present river channel immediately following recession of the June rise in the summer of 1952.” * * *
Accepting arguenéo that * * * “diversion in 1952” appearing m paragraphs 1-07 and 1-09 * * * is incidental, such paragraphs being addressed primarily not to the closure and diversion but rather to other features of work to be performed prior to diversion, nevertheless a clear statement of “diversion in 1952” appears therein. In Paragraph 1-07 * * * it is provided that “Actual diversion in 1952 shall begin when ordered or approved by the Contracting Officer depending on river conditions described in detail in Section V.” * * *
* * * To hold that by Paragraph 5-03<# (5) * * * the contractor was permitted to divert the river when it elected, would necessitate a complete disregard of Paragraph 1-02, * * * requiring operations which will insure diversion “immediately following recession of the June rise in the summer of 1952,” and of the other references in the specifications to “diversion in 1952.”
* * * it is the opinion of this Board that under the contract, diversion is to be made after the so-called June rise of 1952 * * *
* * * this Board finds that there has been no suspension of the work by the Government nor change in the specifications which would require adjustment of the contract price.
*366 29. (a) Plaintiff completed the performance of the contract in November 1952, and the work was duly accepted by defendant on December 8,1952.
(b) Final payment was made by defendant and accepted (under protest) by plaintiff on November 2, 1954. The language of plaintiff’s protest follows:
This Estimate No. 30 — Final * * * is signed and payment thereon is accepted under protest and without prejudice to our Diversion and Closure Claims, and shall not operate as a waiver or release of the undersigned’s right to sue for and recover judgment in the United States Court of Claims on said claims or for damages incurred or losses sustained by the undersigned in the prosecution of the contract work which were occasioned by delays, defaults or other breaches of contract on the part of the United States.
(c) The total contract revenue received by plaintiff was $7,701,295, including payment for the 550,890 cubic yards of earth removed pursuant to Change Order 4.
III. Breach and Mitigation
30. (a) Plaintiff could have completed the contract work in .two seasons (1950 and 1951), as contemplated in its bid, if it had been permitted to do so.
(b) Defendant’s requirement of 1952 diversion and closure, on which was based its refusal to permit completion of the contract in 1951, involved no overt intention on the part of the contracting officer or other representative of defendant to violate the terms of the contract. Defendant’s action was taken on the ground and in the belief that the terms of the contract precluded diversion and closure in 1951 and required them in 1952.[56]
(c) There is no evidence of overt intention on the part of the contracting officer or other representative of defendant to order a suspension of work[57] as to either the contract work *367 in general or, specifically, as to the removal of the plugs.[58]
(d) Defendant did not in fact suspend the work of plaintiff. If, as plaintiff contends, plaintiff itself suspended work with land equipment from July 1, 1951, to June 30, 1952, (during which period a little more than five percent of the dollar volume of the contract work was performed with land equipment), the suspension was the result of plaintiff’s adjustment to defendant’s requirement of 1952 diversion and closure. This adjustment represented one of many choices open to plaintiff in the volume of work to be performed between January 1,1951, and June 30,1952.
31. (a) Plaintiff could have suspended virtually all work at the end of the 1950 working season, to resume in 1952 in time to perform the work it had previously scheduled for 1951 in its first-filed plan of operations.[59] There is no evidence to suggest that such an adjustment to defendant’s requirement of 1952 closing would have resulted in greater mitigation of plaintiff’s loss than would have resulted from a readjustment of the kind made by plaintiff, viz, performance of some of the work during the 1951 season.
(b) Plaintiff’s action in persevering, throughout the working season of 1950, with the work scheduled therefor prior to the contracting officer’s decision of July 6, 1950, was reasonable under the circumstances. Likewise, plaintiff acted reasonably in electing to perform 26 percent of the dollar volume of the contract work during 1951, including, specifically, its election to perform during that year approximately ten percent of the work with land equipment and 16 percent with the dredge assembly. Similarly, its election to perform five percent of the dollar volume of the contract work during the first six (three working) months of 1952 was reasonable.
*368 32. (a) After receipt of the contracting officer’s decision of July 6, 1950, plaintiff unduly delayed action to plan for and find other employment and use, during the working season of 1951, for the men and equipment which would not then be needed for the contract work.
(b) As a result of the delay described in the preceding-paragraph, plaintiff had on the job-site during 1951 more equipment than it reasonably needed to perform the volume of work it had elected to and did perform during that season. To the extent that, except for such delay, plaintiff might reasonably have found employment for such excess equipment, the equipment ownership expense of such excess equipment was not a part of the costs fairly and reasonably incurred in the performance of the contract work.
(c) Defendant’s requirement of 1952 diversion and closure (which had to begin after July 1) made it necessary for plaintiff to commit to the contract work, for the full working season of 1952, all such equipment as might reasonably be needed in the performance of that phase of the work. Similar mobilization would have been necessary in 1951, if diversion and closure had been permitted and undertaken during that year.
(d) If plaintiff had been permitted and had undertaken to make diversion and closure in 1951, it would have had to schedule approximately 30 percent of the dollar volume of the contract work for performance between January 1 and June 30, 1951, and would have had use for the mobilized equipment accordingly.
(e) In mobilizing for diversion and closure in 1952, plaintiff (having performed 26 percent of the work in 1951) scheduled only five percent of the work for performance between January 1 and June 30, 1952, and had use for only enough equipment to perform that volume of work.
(f) The necessity for mobilization during the first six months of 1952 was paramount. Plaintiff could not reasonably have been expected to find other use for the excess equipment except insofar as various pieces might have been assigned to other uses and still be available for the contract work on or before July 1.
*369 (g) To the extent that plaintiff’s assembly of equipment between January 1 and June 30,1952, reasonably represented (1) preparation for the minor volume of work remaining to be performed prior to July 1, and (2) mobilization for the remaining work on the Stage III contract as initially required, the commitment of the equipment reflected costs fairly and reasonably incurred by plaintiff in conforming to defendant’s 1952 requirement.
IV. Damages
33. (a) Plaintiff’s costs of performance, fairly and reasonably incurred, in completing the contract work as required by defendant, were greater than would have been the costs of performance, fairly and reasonably incurred, if it had been permitted to perform the work as bid.[60]
(b) The increase of costs described in the preceding paragraph resulted from the necessity for plaintiff, in adjusting to defendant’s 1952 requirement, to detain some and retard other parts of its organization and equipment.
(c) Insofar as plaintiff’s organization and equipment were detained or retarded as a consequence of its necessary adjustment to defendant’s 1952 requirement, plaintiff lost the profit which it otherwise might reasonably have made upon the use of such organization and equipment.
34. (a) In conforming to defendant’s requirement of diversion and closure in 1952, plaintiff was required to utilize the full capacity of the organization and equipment initially assigned by it to the contract work during two nonconsecutive working seasons, 1950 and 1952, and to utilize part of its organization and equipment during the intervening season of 1951, whereas it had planned upon and prepared for capacity utilization during two consecutive working seasons (1950 and 1951) only.
(b) Plaintiff’s losses (increased costs of performance and loss of profits) occurred during the calendar years 1951 and 1952. They were concentrated in the 18-month period ex *370 tending from January 1, 1951, to June 30, 1952, although some of them occurred after July 1, 1952. None of them occurred prior to January 1,1951.
(c) It is not established by the evidence that the increased costs fairly and reasonably incurred by plaintiff through the ownership expense of idle equipment or by way of excess overhead (field or home office) can reasonably be measured by a “standby period” (as for delay) extending from July 1,1951, to June 30,1952.[61]
35. Several of the elements of increased costs of performance have been identified in and established by the evidence in terms of the occurrence of loss (cause and effect) as distinguished from the amount thereof.[62] Those were:
(1) Equipment ownership expense.
(2) Freight charges, for moving back to (or replacing at) the job equipment that had been removed for use elsewhere.
(3) Expense resulting from postponement of the removal of the plugs.
(4) Costs resulting from increases, during 1952, in wage rates and in the prices of materials and supplies.
(5) Costs incurred in recruiting and training new labor for the work of diversion and closure in 1952, and costs resulting from the inefficiency of the inexperienced crews.
(6) Maintenance costs, of crews employed to look after completed work and unused equipment during parts of the extended performance time.
(7) Overhead costs, field and home office, accruing as a result of the extension of the time for performance.
*371 36. (a) The postponement of the removal of the pings[63] required plaintiff (1) to maintain the access roads and ramps for 10% months longer than would otherwise have been necessary and (2) to make three moves with the dredge which would not otherwise have been necessary.[64]
(b) The fair and reasonable cost of maintaining the access roads and ramps was $1,926.18, exclusive of equipment ownership expense (which cannot be determined from the evidence) . The fair and reasonable cost of the extra moves of the dredge (including equipment ownership expense) was $19,000. The fair and reasonable cost of postponed plug removal (total of the two foregoing items) was $20,926.18.
37. (a) Excepting the item of claim described in the preceding finding, the evidence fails to establish the amounts reasonably attributable to any of the other elements of loss within limits warranting specific findings.
(b) While there were increases during 1952 in wage rates and in the prices plaintiff had to pay for materials and supplies, which increases would not have been applicable in 1951, plaintiff has failed to differentiate between the amounts paid, because of such increases, for the work of the Stage III contract as initially required, and the amounts paid, because of such increases, in the performance of the work done under Change Order 4 of the Stage III contract.[65]
(c) For the final phase of the work, beginning July 1, 1952, plaintiff had to recruit new crews of labor, having disbanded its previous work force on this job almost a year *372 earlier, wben there remained so little to be done with land equipment until the diversion and closure could be made. Plaintiff incurred some costs which it would not otherwise have incurred (1) in recruiting labor at the time of year this recruitment was made; (2) in training inexperienced men to handle some of the heavy equipment; and (3) in loss of production because of the inefficiency of inexperienced men. Some extra costs were also incurred in looking after completed work and idle equipment during part of 1951. The evidence which plaintiff offered to establish the amounts of these 6xtra costs was excluded.[66]
(d) Plaintiff incurred costs which it would not otherwise have incurred in returning to the job-site, or in replacing at the job-site, equipment it had removed from there for use elsewhere in mitigating its losses. Detailed schedules were placed in evidence itemizing the cost of these one-way freight charges in the sum of $123,872. These charges represent increased costs fairly and reasonably incurred to the extent that (1) the equipment so moved was reasonably needed for the contract work and (2) the many new pieces of equipment moved to the job in 1952 represented replacements of pieces previously removed.[67]
38. (a) The largest single item in plaintiff’s claim was for equipment ownership expense. It is reasonably to be inferred from the evidence as a whole that the largest single factor in the increased costs fairly and reasonably incurred by plaintiff in conforming to defendant’s requirement of diversion and closure in 1952 was the ownership expense of *373 equipment detained or retarded in use as a result of the extension of the performance time.[68]
(b) The detention and retardation in use of parts of plaintiff’s organization and equipment, as described in finding 33 (b), resulted in further increases of costs fairly and reasonably incurred through overhead, in the field as well as in the home office. The amounts of the costs so incurred cannot be determined from the evidence.[69]
(c) Similarly, the amount of the profit lost by plaintiff as a result of the detention and retardation of its organization and equipment, as described in finding 33 (c), cannot be determined from the evidence.[70]
39. The nature of the available evidence relating to the amount of damages precludes determination of the amount except by a broad inference in the nature of a jury verdict covering in one lump sum all elements of loss. On this basis it is concluded that, if plaintiff is entitled as a matter of law to recover, the amount of the recovery should be $225,000.
V. Contract Provisions
40. (a) Many of the contract provisions were contained in articles that are standard in Governmental construction *374 contracts. The texts of the provisions material to this suit are set forth in the remaining subdivisions of this finding.
(b) The text of Article 3 follows:
Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings, and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of the Army or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
(c) The text of Article 9 (a) follows:
Termination for Default. — If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in the contract, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess costs occasioned the Government thereby, as well as for liquidated damages for delay, as fixed in the specifications or accompanying papers, for such reasonable time as may be required to complete the work, or if liquidated damages are not so fixed, the contractor and his sureties shall be liable to the Government for any actual damages occasioned by such delays. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize for completing the work *375 sucli material, appliances, and plant as may be on the site of the work and necessary therefor.
(d) The text of Article 13 follows:
Other contracts. — The Government may award other contracts for additional work, and the Contractor shall fully cooperate with such other Contractors and carefully fit his own work to that provided under other contracts as may be directed by the Contracting Officer. The Contractor shall not commit or permit any act which will interfere with the performance of work by any other Contractor.
(e) The text of Article 15 follows:
Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising rnider this contract shall be decided by the Contracting Officer subject to written appeal by the Contractor within 30 days to the Head of the Department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with the work as directed.
(f) The text of Article 26 follows:
Definitions. — (a) The terms “Secretary of the Army” or “Head of the Department” as used herein shall have one and the same meaning and shall include The Assistant Secretary of the Army, and the term “his duly authorized representative” shall mean the Chief of Engineers, Department of the Army, or an individual or board designated by him.
(b) Except for the original signing of this contract and except as otherwisé stated herein, the term “Contracting Officer” as used herein shall include his duly appointed successor or his authorized representative.
41. (a) The specifications[71] were divided into four parts: Statement of Work (Part I); General Conditions (Part II); Special Conditions (Part III); and Technical Provisions (Part IV). Numbered paragraphs in each of the first three parts were identified by prefixed letters: SW, GC, and SC. Part IV was divided into eight sections, and the para *376 graphs in the sections were identified by prefixed numbers, e. g., 1-02, 3-05,7-06.
(b) The Statement of Work (Part I) listed the following “Principal Features”: clearing and grubbing; excavation; embankment and blanket; diversion of the river; closure; and miscellaneous (placement of various facilities).
(c) Extensive portions of the text of Parts II, III, and IY of the specifications are material to the questions presented by this suit. Such portions are set forth in the three findings next following.[72]
42. (a) Following is the text of GC-3:[73]
Site Investigation and Eepresentations. The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads, and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other materials upon which information is reasonably obtainable and which can in any way affect the work or the cost thereof under this contract. The contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and sub-surface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications made a part of this contract. Any failure by the Contractor to acquaint himself with all the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the *377 contract expressly provides tbat the responsibility therefor is assumed by the Government. Representations made hut not so expressly stated and for which liability is not expressly assumed by the Government in the contract shall be deemed only for the information of the Contractor.
(b) Following is the text of GC-5:
Progress Charts, and Requirements for Overtime Work.
a. The Contractor shall within 5 days or within such time as determined by the Contracting Officer, after date or commencement of work, prepare and submit to the Contracting Officer for approval a practicable schedule, showing the order in which the Contractor proposes to carry on the work, the date on which he will start the several salient features (including procurement of materials, plant and equipment) and the contemplated dates for completing the same. The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion at any time. The Contractor shall enter on the chart the actual progress at the end of each week or at such intervals as directed by the Contracting Officer, and shall immediately deliver to the Contracting Officer three copies thereof.
b. The Contractor shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts and overtime operations, as may be necessary to insure the prosecution of the work in accordance with the approved progress schedule. If, in the opinion of the Contracting Officer, the Contractor falls behind the progress schedule, the Contractor shall take such steps as may be necessary to improve his progress and the Contracting Officer may require him to mcrease the number of shifts, and/or overtime operations, days of work except Saturdays, Sundays and holidays, and/or the amount of construction plant, all without additional cost to the Government. Provided, that the provisions of this paragraph shall not be construed as prohibiting work by the Contractor if he so elects on Saturdays, Sundays, or holidays.
g. Failure of the Contractor to comply with the requirements of the Contracting Officer under the provisions shall be grounds for determination by the Contracting Officer that the Contractor is not prosecuting the work with such diligence as will insure completion within the time specified. Upon such deter-? *378 initiation tbe Contracting Officer may terminate tbe Contractor’s right to proceed with tbe work, or any separable part thereof, in accordance with the delays-damages article of the contract.
(c) Following is the text of GC-11:
Suspension of Work. The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the Contractor, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time causing additional expense or loss, not due to the fault or negligence of the Contractor, the Contracting Officer shall make an equitable adjustment in the contract price and modify the contract accordingly. An equitable extension of time for the completion of the work in the event of any such suspension will be allowed the Contractor provided however, that the suspension was not due to the fault or negligence of the Contractor.
43. (a) Following is the text of SC-1:[74]
Commencement, Prosecution and Completion. The Contractor will be required to commence work under this contract within thirty (30) calendar days after the date of receipt by him of notice to proceed, to prosecute said work with faithfulness and energy, and to complete the entire work ready for use in accordance with the following schedules:
Work to be Performed Completion Date Liquidated Damages (For each calendar day of delay)
Completion of excavation from area D- 1 July 1951_ $200. 00
River channel — Protection of river bed at diversion dam;
Left bank — Excavation of overburden and chalk from area H except as specified in subpara-graph l-09e- 20 November 1951 200. 00

*379
Work To Be Performed, Completion Date Liquidated Damages (Dor each calendar day of delay)

Completion of rolled embankment on right bank to Elevation 1315 and left bank rolled embankment to Elevation 1395, impervious blanket in right bank, approach and discharge channels and balance of diversion prepa-ration_ 15 July 1952_ $500. 00
Completion of rolled embankment and impervious blanket in clo-sure_ 20 November 1952 700. 00
Balance of work_ 1 March 1953_ 100. 00
The time stated for completion shall include final cleanup of the premises. The provisions of paragraph GC-5 of these specifications will be strictly enforced by the Contracting Officer to secure performance of the work within the time limitation specified for its accomplishment.
(b) Following is the text of SC-4:
Payments, a. The Biver and Harbor Act approved 22 September 1922 contains the following provision: “That any work of improvement herein adopted and any public work on canals, rivers and harbors adopted by Congress may be prosecuted by direct appropriations, by continuing contracts or by both direct appropriations and continuing contracts.”
b. Under the contract to be entered into under these specifications such work as may be done subsequent to 30 June 1950, or in excess of the amount for which funds are available for payment as herein set forth, will be continued with funds to be hereafter appropriated.
e. From funds heretofore appropriated by the Civil Works Fiscal Year 1950 Appropriation Act, the sum of $50,000 has been initially allotted and will be reserved for payments in connection with this contract, including all costs of superintendence and inspection and all collateral and incidental expenses in connection therewith. Of this sum, the amount of about $47,000 is available for payments of the Contractor’s estimates.
a. If at any time it becomes apparent to the Contracting Officer that the balance of this allotment and reservation is in excess of the amount required to meet all payments due and to become due the Contractor because of work performed and to be performed until 30 June 1950, and for all supervisory, collateral, and incidental *380 expenses in connection therewith, until that date, the right is reserved after due notice to the Contractor to reduce said allotment and reservation by the amount of such excess.
e. If the rate of progress of the work is such that it becomes apparent to the Contracting Officer that the balance of the allotment and reservation is less than that required to meet all payments due and to become due to the Contractor because of work performed and to be performed until 30 June 1950, and for all supervisory, collateral, and incidental expenses in connection therewith until that date, the Government may allot and reserve additional funds for payments under this contract if there be funds available for such purpose. The Contractor will be advised of any additional allotment so made.
/. It is expected that prior to 30 June 1950 the Congress will make additional appropriations applicable to work under this contract, but as to this, it must be distinctly understood and agreed that the Government is in no case to be made liable for damages in connection with this contract on account of delay in payments on same due to a lack of available funds. Should it become apparent to the Contracting Officer that the available funds will be exhausted before additional funds are appropriated, the Contracting Officer will give 30 days’ written notice to the Contractor that work may be suspended; but, if the Contractor so electSj he may continue work under the conditions and restrictions of the specifications, after the time set by such notice, so long as there are funds for inspection and superintendence, with the understanding, however, that no payment will be made for such work until additional funds shall have been provided in sufficient amount. When funds again become available, the Contractor will be notified accordingly. Should work be thus suspended, additional time for completion will be allowed equal to the period during which work is necessarily so suspended, as determined by the dates specified in the above-mentioned notices.
g. So long as funds are available, payments will be made monthly in accordance with Article 16 of the contract. Unless otherwise authorized in writing by the Contracting Officer, the items of work for which payment will be made shall be limited to those listed and enumerated in the contract. The unit price or lump sum price or prices stated in the contract will be used in de- *381 terminating the amount to be paid and shall constitute full and final compensation for all work.
h. The procedure above described will be repeated as often as may be necessary on account of the exhaustion of available funds and the necessity of awaiting the appropriation of additional funds by Congress.
i. Should Congress fail to provide additional funds during its regular session as expected, the contract may be terminated and considered to be completed, at the option of the Contractor, without prejudice to him, at any time not later than 30 days after payments are discontinued, or if payments have been previously discontinued, not later than 30 days after the passage of the act which would ordinarily carry an appropriation for continuing the work, or after the adjournment of Congress without passing such Act.
(c) SC-5 required that the work should “conform to the following contract drawings and maps, all of which form a part of these specifications * * and listed 37 “drawings” dated March 1950 and one dated April 1950.
(d) Following are (1) the opening sentences of SC-7 and the text of SC-7 (b) (1) and (2):
Physical Data. The information and data furnished or referred to below are not intended as representations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for any interpretation or conclusion drawn therefrom by the Contractor. * * *
5. Streamfiow and Eiver Stages.
(1) * * * The Contractor shall schedule his operations as necessary to take advantage of the most favorable river stage. The Contractor shall make his own assumptions relative to the effect of releases from the Fort Peck Eeservoir on the work to be done under this contract. The Government will not be responsible for any damage resulting from the supplemented river stages except as provided in paragraph SC-21 — Damage to Work.
(2) The runoff of the Missouri Eiver at the Fort Eandall site follows a characteristic annual pattern as determined from climatological and river data since about 1880 and sustained by historical data extending from early in the 19th century. Early spring is marked by rapid melting of snow and ice in the plains area, accompanied usually by only very little rainfall, resulting in the so-called “March rise” usually occurring in March *382 or April. Late spring, consisting generally of the months May, June and early July, is characterized by extensive general rains and rapid melting of snow in the mountains, resulting in the so-called “June-rise” with peak discharge usually less and volumes usually greater than during the early spring rise. Summer and autumn are generally characterized by diminishing general rainfall, widely scattered intense rainstorms and occasional severe general storms. Flow in the river ordinarily decreases rapidly in July from the high June rates and thereafter decreased gradually with infrequent interruptions to the low flows which prevail in the winter. It will be noted from the stage hydrographs that the operation of Fort Peck has had a marked effect in recent years upon late summer and fall flows as a result of the release of impounded flood flows.
(e) Following is the text of SC-18 (a) and (b):
Plant, a. General. The Contractor agrees to keep on the job sufficient plant to meet the requirements of the work. The plant shall be in satisfactory operating condition and capable of safely and efficiently performing the work as set forth in the specifications, and the plant shall be subject to inspection by the Contracting Officer at all times. * * * No reduction in the capacity of the plant employed on the work shall be made except by written permission of the Contracting Officer. The measure of the “capacity of the plant” shall be its actual performances on the work to which these specifications apply. Plant numbers will be displayed prominently on all major items of equipment when so directed.
■b. Hydraulic Fill Equipment. If the Contractor elects to place embankment by hydraulic methods as specified in Section VI, such equipment shall be in first class operating condition and complete with sufficient spare parts to maintain the equipment at maximum operable condition at all times. The capacity of the plant shall be sufficient to maintain excavation and placement schedules approved by the Contracting Officer.
(f) Following is the text of SC-22:
Work by Others, a. Work in Progress. In accordance with Article 13 of the contract, all Contractors on the work which may be in progress shall, insofar as practicable, have equal rights to the use of roads, grounds, etc., but in no case will one Contractor be permitted to use any facility installed or constructed by *383 another Contractor without his prior consent and without the prior approval of the Contracting Officer. It is expected that the major construction listed below and minor construction not listed, in addition to the work included in this contract, will be in progress during the construction period of this contract.
(1) Construction of Tunnels (Estimated completion date 1 February 1951).
(2) Construction of Kegulating Gate Structure, Tunnel Terminal Structure, Powerhouse Substructure, Tail-race Floor Slab and Stilling Basin (Estimated final completion date 1 July 1951).
(3) Construction of Intake Structure complete with Approach Slab, Intake-to-tunnels Closure Section, Installation of Gate and Bulkhead Frames ready to receive the uncontrolled river. (Estimated final completion date 1 January 1952 with scheduled completion of all work ready to receive the flow of the river 1 June 1951).
(4) Contracts for the Gantry Crane, Penstocks, Surge Tanks, Spillway, and Powerhouse superstructure with equipment may also be awarded during the life of this contract.
6. Interference. Because of other construction work scheduled during the life of this contract, it will be necessary for all contractors to closely coordinate their work in order to avoid undue interference. In order that the various contractors may be given the best information possible, the use of various areas by the several contractors is shown on Drawing No. MR14-31E2'. Although certain areas have been designated for the exclusive use of individual contractors, each contractor will be required to arrange and coordinate his work with that of others so that no undue hardship will be imposed on any contractor because of prior assignment of work areas. Joint use of areas by several contractors will be effected to the maximum extent feasible as determined by the Contracting Officer. If at any time during the construction period, certain assigned areas are not being used effectively by the Contractor, and if such areas are more urgently required by another contractor, the Government reserves the right to reassign these same areas to others as may be in the best interests of the Government. Such reassignment shall not be the basis of a claim against the Government. In case of disagreement regarding the use of various areas, the decision of the Contracting Officer shall be final.
*384 (g) Following is tlie test of SC-23:
Order of Work. Detailed requirements for order of work are listed in Section I. Approximately sixty (60) days before beginning the construction operations which, are scheduled for completion by 15 July 1952, except for items of diversion works, the Contractor shall submit a detailed plan of operations to the Contracting Officer for approval. Prior to 1 October 1951 the Contractor shall submit a detailed plan for construction of the diversion works and closure. These plans shall include a statement of the methods and equipment to be used in the work, the location of haul roads, the Contractor’s proposal for surface and subsurface water control, and a schedule indicating the order in which work is to be done. Approval of the methods and equipment does not relieve the Contractor of any responsibility for completing the work in the manner intended by these specifications.
(h) Following is the text of SC-28 (b) :
Drainage and Unwatering, b. Work by Others. The contractors for Schedule A Work (Intake Structure) and Schedule C Work (Stilling Basin and Powerhouse Substructure) are working m Areas B and J respectively which areas have been excavated to depths up to 30 feet below the normal river level; their work requires that Areas B and J be kept unwatered until 1 July 1951, at which time the terms of the contracts for Schedules A and C Work require that the work be completed ready to receive the flow of the river. The Intake Structure excavation in Area B is protected from seepage inflow from the river alluvium by a natural chalk dike across the approach channel. The Stilling Basin and Powerhouse excavation in Area J is protected from seepage inflow from the river alluvium and from high river stages by a natural and dumped chalk dike over river alluvium. A well point system installed along the inner slope at the protective dike, and a foundation pressure relief system, are operated by the contractor for Schedule C to protect his work from damage by water. Effluent from these systems is discharged into Area M downstream of the dike, from where it shall be handled by this Contractor as required in the performance of his work. Removal of the protective dikes and access ramps for Areas B and J are included in the work under this contract, however, these facilities shall remain in condition to serve the needs of the Contractors within the Areas until 1 July *385 1951 unless their prior removal is approved by the Contracting Officer on the conditions that they are no longer required or that equivalent protective dikes, ramps and dewatering systems are continuously provided by and at the expense of the Contractor.
44. (a) Part IV of the Specifications contained the Technical Provisions. Section I of Part IV was indexed under the heading “Earthwork — General”. Following are the texts of eight paragraphs in Section I:
1 — 01. Scope. This section of the specifications pertains to all earthwork operations required under the contract, and is introductory to the detailed requirements for the various earthwork operations contained in subsequent sections of these specifications. In addition, this section contains specific technical provisions for unwatering certain areas during excavation and embankment operations.
_ 1-02. Principal Earthwork Operations. The principal earthwork operations to be performed under this contract are described in the following paragraphs. The Contractor shall perform these operations, and all other earthwork operations incidental thereto, in accordance with a schedule of operations which will insure diversion of the river and closure of the present river channel immediately following recession of the June rise in the summer of 1952. The schedule of operations shall also conform to the general requirements shown on Drawing No. MR14-31E2 (Area use). All earthwork specified in this section shall be executed in accordance with the drawings and with the provisions of all applicable sections of the specifications.
1-04. Outlet Works Approach Channel, a. General. The Contractor shall excavate overburden above and below elevation 1245 and chalk to open the channel in preparation for diversion. Overburden below elevation 1245 is largely water bearing alluvial sand, as indicated on drawings MB14 — 31E5 and MR14-31E6. Suitable materials for construction of rolled embankment, impervious blanket, upstream chalk berm and blanket foundation for the closure area are available from the required excavation. The chalk immediately upstream of Area B as shown on drawing MR14-31E2 forms a plug to protect the intake structure area from flooding due to high river stages, seepage from ground water and runoff from a tributary coulee which drains approximately 10 square miles north of the channel. Impervious blanket shall be constructed on the bottom and *386 south side of the channel at two locations to form a continuation of the upstream impervious blanket across the pervious bottom of the approach channel.- The impervious blanket construction is largely below the ground water table and will require unwatering. It shall be the responsibility of this Contractor to handle runoff from the tributary coulee (which is presently diverted in a channel excavated in chalk) and to conduct his operations in such manner as to insure access for the Intake Structure Contractor to his work area and to prevent water from Area A entering the Intake Structure area prior to 1 July 1951 unless otherwise authorized by the Contracting Officer.
1-05.- Outlet Works Discharge Channel, a. General. The Contractor shall excavate overburden above and below elevation 1245 and chalk to open the channel in preparation for diversion as indicated on drawings MR14-31E7 and MR14 — 31É8. Overburden below elevation 1245 is largely water bearing alluvial sand. Excavated overburden which is suitable for rolled embankment shall be used in completing the embankment on the left bank. Chalk shall be used for discharge channel dumped slope protection, construction of the downstream chalk berm and spoiled in Area O all as designated on drawing MR14-31E2. Alluvial sand shall be spoiled in Area O. The method of excavating the water bearing sand and the underwater chalk is optional with the Contractor, except that the sand which lies below the normal channel bottom, and which is required to be excavated for placement of riprap slope protection, shall be excavated only after the slope protection area is un-watered to its full depth. The necessary unwatering system shall be continued in operation for placement of the slope protection riprap. The existing haul road embankment and the underlying chalk in the upstream portion of Area M together with an existing well point system operated by the Contractor constructing the Stilling Basin and Powerhouse Substructure (Schedule C of Outlet Works) presently protect Area J from flooding due to high river stages and ground water infiltration. It shall be the responsibility of the Contractor for the earthwork to conduct his operations in such manner as to insure that the Contractors for Outlet Works construction in Area J have continuous access to their plant and work areas and so that the effectiveness of their protective works is not hampered prior to 1 July 1951, unless otherwise authorized by the Contracting Officer.
*387 1-06. Spillway Area. The Contractor shall excavate overburden above elevation 1245 and shale from Areas D and E as indicated on drawings ME14-31E2, MR14-31E9, and MR.14-31E10 and shall construct rolled embankment and upstream chalk and shale berms, respectively, of the material. The work in Area D is assigned an early completion date so that the area may be made ready as a construction plant area and work area for spillway construction work which is expected to begin during the summer of 1951. Area E is the source of material for the rolled embankment and impervious blanket construction in the closure section. Área E will provide an extension of the work area for spillway construction and this Contractor shall conduct his work in a manner to cause the least interference to spillway construction in Area D. Excavation in Area H will expose the foundation of the spillway stilling basin. Area H is the source of chalk for the diversion operation.
1-07. Diversion. Actual diversion in 1952 shall begin when ordered or approved by the Contracting Officer depending on river conditions described in detail in Section V. The Contractor will be permitted to submit for approval an alternate to the Government plan for diversion. Special preparation for diversion, consisting of protection of the right bank and river bed, provisions for dumping chalk in the diversion dam, haul roads, and appurtenant work all as specified in Section Y shall be ready for use.
1-08. Closure. Following diversion of the river through the outlet works, closure of the river channel areas shall be made. Operations shall be made separately, in the “Embankment Zone” immediately upstream from the diversion dam and in the “Blanket Zone” adjacent thereto. The Embankment Foundation below normal river level of 1245 may be constructed by means of unwatering the river in the embankment zone and placing rolled embankment, or by placing pervious material in water by hydraulic methods to such level as will sustain equipment for placing rolled embankment above. The Blanket Foundation may be constructed by means of dumping pervious material in water or by hydraulic methods to such elevation as will sustain operations for placing impervious blanket. The order of construction is designated on Drawing No. MR14-31E16.
1-09. Order of Work. a. General. The work shall be carried on at such locations and in the sequence herein outlined and in minimum conflict with the activities of other Contractors working concurrently. Attention is *388 directed to the completion dates and liquidated damages specified in paragraphs SC-1 and SC-2.
b. Eight Bank. The following work shall be completed prior to 31 December 1950.
(1) Completion of the cutoff trench.
(2) Sloping of steep banks adjacent to cutoff trench as shown on the drawings.
(3) Construction of the blanket to elevation 1250 on the right bank.
(4) Completion of all bank protection on the right bank corresponding to fills placed. The impervious blanket and the main embankment on the right bank shall be completed to elevation 13'15 prior to diversion of the river in 1952. The main embankment shall be raised to elevation 1325 following diversion and prior to 20 November 1952.
g. Left Bank. The embankment on the left bank between Station 109+80 and Station 110+80 shall be completed to elevation 1395 by 15 November 1950 to receive an abutment for a bridge being constructed under an existing contract. If the Contractor elects to complete only the embankment in the vicinity of the abutment by 15 November 1950 access from elevation 1365 to elevation 1395 should be provided by suitable ramps. Layout slopes of ramps shall be subject to the approval of the Contracting Officer. Excavation of overburden above elevation 1245 and shale in Area D as shown on drawing MR14-31E2 shall be completed prior to 1 July 1951. Excavation of overburden and chalk in Area H shall be completed prior to 20 November 1951 except for excavation of 130,000 cu. yds. of chalk in the upstream and landside of Area H which shall be reserved for use in diversion of river. The following work shall be accomplished prior to the start of diversion in 1952.
(1) Completion of the approach channel.
(2) Completion of the impervious blanket at two locations in the approach channel.
(3) Completion of the discharge channel.
(4) Completion of- slope protection in the discharge channel.
(5) Completion of the embankment on the left bank to elevation 1395.
d. Diversion of the River. The following work in preparation for diversion shall be completed on or prior to the dates specified:
(1) Protection of the right bank and river bed at the location of the diversion dam — 20 November 1951.
*389 (2) Construction trestle, or similar means of dumping cbalk in the diversion dam — 15 July 1952.
(3) Access roads and ramps to site of diversion dam — 15 July 1952.
(4) Provide satisfactory floating equipment with acceptable devices for controlling floating debris — Prior to start of trestle or similar structure.
(5) Eemoval of plugs in the approach and discharge channels — 15 July 1952.
The Contractor shall begin actual diversion operations as specified in Section V.
e. Closure. The order of completion for the closure blanket and embankment are shown on drawing ME1N31E16 and specified in Section VI. The objectives for specified order of completion are to provide (a) Protection against late summer floods and (b) Protection against early spring floods.
(b) Following are the texts of three paragraphs in Section V of Part IV of the Specifications, relating to the diversion of the river:
5-02. Climatological, Hydrographic and Hydraulic Data. o. Diversion Discharge Eating Curves indicate the computed relationship between the river pool level at the mouth of the approach channel and the discharge through the outlet works structures, with either 12 or 10 tunnels in operation. It is expected that 12 tunnels will be available during the period of the diversion operation. It is also anticipated that 2 of the 28-ft. diameter tunnels will be removed from diversion service after completion of the diversion dam and prior to 1 September 1952, so as to permit installation of power plant.
d. Flow Frequency Curves shown on drawing ME14-30E18 indicate the probable frequency of occurrence of three selected flows during the days of .July and August. The date indicated for each of the three flows is the first day of seven successive days during which the flow is less than indicated. The curves are based on nineteen years of record as modified by releases from Ft. Peck Eeservoir controlled at 4,000 c. f. s. The curves indicate approximately fifty percent (50%) chance of the occurrence of flows of 30,000 c. f. s. or less for seven successive days beginning on 16 July which are the conditions of flow and the earliest date that diversion would be ordered by the Contracting Officer. The curves also indicate that the probable latest date of the beginning of seven successive days of flows *390 of 40,000 c. f. s. or less would be 3 August which conditions are the maximum flow and latest expected date that diversion would be ordered by the Contracting Officer.
5-03. General Requirements, a. Diversion of the river shall be accomplished either by methods developed by the Contractor and fully approved in all details by the Contracting Officer, or by the method developed by the Government, details of which are specified _ and shown in these specifications and plans. Under either method the completion time for preparation for diversion and the actual act of diversion will be subject to strict regulations of the Contracting Officer.
5. Basic Requirements. Any scheme for diversion shall be based upon the following requirements:
(1) Adequate protection of the right bank shall be provided against erosion and alteration of the river bank from the upstream end of the impervious blanket to the downstream limit of the rolled embankment. _
_ (2) The bed of the river shall be stabilized against shifting and change in section within the limits shown on the drawings.
(3) Adequate means shall be provided for the rapid deposit of chalk in the form of a dam to be built up in level layers of uniform thickness the full width of the river channel.
(4) After the start of diversion has been ordered by the Contracting Officer the Contractor will be required to complete diversion on the earliest date possible by the continuous placement of chalk at the minimum rate of 25,000 cubic yards (quarry measure) per 24-hour period. Adequate equipment and manpower shall be mobilized and used to complete diversion at the above specified rate.
c. Submission of Detailed Plan for Diversion. Regardless of whether the Contractor proposes to follow me Government plan for diversion or his own plan for diversion, complete details for diversion shall be submitted to the Contracting Officer not later than sixty (60) calendar days prior to start of preparation for diversion. Preparation for diversion shall not be started until the entire plan for diversion has been approved by the Contracting Officer.
d. Time of Diversion. After special preparations for diversion have been completed, the start of diversion will be ordered or approved by the Contracting Officer under any of the conditions stated below.
*391 (1) On 16 July 1952 if tbe streamflow is 30,000 c. f. s. or less;
(2) On the first day following 16 July 1952, but prior to 1 August 1952 that the streamflow diminishes to 30,000 c.f.s.;
(3) On 1 August 1952 if the streamflow is between 30,000 c. f. s. and 40,000 c. f. s.;
(4) On the first day following 1 August 1952 that the streamflow diminishes to below 40,000 c. f. s.
(5) The Contractor may at his option divert the river prior to 16 July 1952 if special preparations for diversion are completed even if the streamflow exceeds 30,000 c. f. s.; or on any date between 16 July 1952 and 1 August 1952 when the river-flow exceeds 30,000 c. f. s. In case the streamflow rises above 40,000 c. f. s. during diversion operations, the Contractor will be permitted to cease operations until the flow recedes to below 40,000 c. f. s.
5-04. Government Plan for Diversion.[75]
a. General. The Government plan for diversion has been designed to provide for certain definite work preparatory to diversion, and for the actual diversion of the river.
5. Preparation for Diversion shall consist of shaping the right bank slopes and placing a ballasted lumber mattress on the right bank and in the river bed; construction of a timber trestle 800 ft. in length extending from the right bank to a point near the left bank; placement of a chalk dike or ramp from the left bank to the trestle; all as indicated on the drawings; construction of the necessary haul roads; stock piling of boulders; and appurtenant work.
_ g. Diversion. Following completion of the preparation for diversion, the act of diversion shall be accomplished by the rapid dumping of chalk from the trestle in the form of a dam rising from the river bottom in horizontal layers until the river flow is diverted. The act of diversion is defined as the operation of placing chalk and boulders in the diversion dam to ultimate crest elevation 1265 and to the corresponding cross sections shown on the drawings; removal of floating debris and the resultant diversion of the river through the Outlet Works, all as specified in this section of the specifications.
*392 (c) Following is the text of one paragraph in Section VI of Part IV of the Specifications, relating to closure of the river after diversion :
6-08. Sequence of Operations. The sequence of op-perations under optional methods of construction is shown on drawing ME14-31E16. The order of work will depend upon the method chosen for construction of the “Embankment Foundation” as outlined hereinafter.
a. Embankment Foundation Fill Placed in Un-watered Eiver Channel. The first order of construction shall be placement of the blanket closure fill (first stage) at the upstream edge of the blanket zone. This is to permit the lowering of the water in the closure _ area to tailwater so that the remaining blanket foundation will be placed at the lowest possible level. The second order of construction shall be placement of the blanket closure fill (second stage) at the downstream edge of the blanket zone; this includes a dumped shale embankment to elevation 1275 over the impervious blanket. The objective of this work is to provide the earliest possible protection against overtopping the work by possible floods and to permit unwatering of the embankment zone. The third order of construction shall be placement of that portion of the embankment between its upstream slope and the center line of the dam. The objective is to have the embankment at the highest level at all times to provide maximum protection against overtopping. The fourth order of construction shall be placement of the balance of the blanket closure fill and rolled embankment as required to complete the contract work.
5. Embankment Foundation Fill Placed in Water. The first order of construction shall be placement of the blanket closure fill (first stage) at the upstream edge of the blanket zone. This fill is placed to permit the lowering of the water in the closure area to tail-water so that the remaining blanket foundation and the embankment foundation will be placed at the lowest possible level. The second order of construction shall be the placement of pervious embankment foundation and the overlying embankment closure fill, first stage (the upstream portion of the rolled embankment to elevation 1275). The objective of this work is to provide the earliest possible protection against overtopping by possible floods. The third order of construction shail be placement of the remaining portion of the embankment upstream of the center line of the dam. The objective is to have the embankment at the highest level *393 at all times to provide maximum protection against overtopping. The fourth order of work shall be placement of the balance of the blanket closure fill and rolled embankment as required to complete the contract work.
e. Use of Equipment. Insofar as it is feasible all available equipment shall be used to accomplish construction of closure section in the specified sequence; however, simultaneous construction of the various features will be permitted to insure the use of equipment in an efficient maimer.
45. The differences between the draft specifications of August 1949 and the official specifications of March 1950 included one or more changes in each of 71 paragraphs.[76] Many of the changes reflected refinements and clarifications characteristic of the evolution of specification requirements. The changes relating to dates, which were crucial to the divergent interpretations by the parties, are listed below.
(1) In SC-23 the dates “15 July 1952” and “1 Oct. 1951” were substituted for “15 July 1951” and “1 July 1950” respectively.
(2) In paragraph 1-02, after the words “in the summer of”, the figure “1952” was substituted for “1951”.
(3) In paragraph l-04a, the date “1 July 1952” was substituted for “1 July 1951”.
(4) In paragraph 1-05a, the date “1 July 1952” was substituted for “1 July 1951”.
(5) In paragraph 1-07, after the words “actual diversion in”, the figure “1952” was substituted for “1951”.
(6) In paragraph 1-095, “in 1952” was substituted for “in 1951”.
(7) In paragraph l-09e, “in 1952” was substituted for “in 1951”.
(8) In paragraph l-09<$ (1), the date “20 Nov. 1951” was substituted for “15 Nov. 1950”.
(9) In paragraphs 1-09d (2), (3), and (5), the date “15 July 1952” was substituted for “15 July 1951”.
(10) In paragraph 5-02c, the date “1 Sept. 1952” was substituted for “1 Sept. 1951”.
(11) In paragraphs 5 — 03c? (1), (2), (3), (4), and (5), the several 1951 dates were changed to 1952.
*394 (12) In paragraph 5-06c, several references to “15 July 1951” and “1 Aug. 1951” were deleted, and the paragraph was rephrased with no reference to dates.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States two hundred twenty-five thousand dollars ($225,000).

 Three of these contractors were at wort on the Intakes, tunnels, outlets, and stilling basin when the invitation was issued for bids for the contract in suit.

 As plaintiff read the contract this option was affirmatively expressed. In other words, plaintiff’s interpretation was not premised! on the normal usage hereinafter mentioned, whereby Government contracts usually may be completed in less time than designated in the contract unless permission to do so is expressly withheld.

 The submission and recommendation by the Area Engineer were made on the hypothesis of a modification of the contract to permit two-season performance, which the Area Engineer considered desirable from the Government’s standpoint.

 Plaintiff never submitted a proposed modification but relied on its request for consolidation.

 Citing Noonan v. Bradley, 9 Wall. 407; Chambers v. United States, 24 C. Cls. 387, 392; Callahan Construction Co. v. United States, 91 C. Cls. 538, 611; Blair v. United States, 99 C. Cls. 71, 135; 321 U. S. 730.

 When the contracting officer directed plaintiff to submit a proposal for modifying the contract by reason of a change in the specifications resulting from postponement of the removal of the plugs, he admitted that the contract as worded authorized removal in 1951. His reasoning, that the plugs should remain in place to protect the approach and discharge channels until diversion of the river, indicates his further belief that removal of the plugs was part of the diversion operation, and suggests further room for doubt that the specifications were reasonably susceptible of no interpretation other than that given by him in his decision of July 6,1950.

 Defendant, as heretofore noted, recognized plaintiff’s bid-position advantage in terms of its existing mobilization only, and never gave consideration to the advantage accruing from mobilization plus an option to complete the wort in 1951.

 Contracting is a highly competitive business, the nature of which was presumably unknown to the Marquis of Queensberry.

 Details are set forth In the findings (specifically, finding 26). At the beginning of 1951 plaintiff had' on the job 38 percent (of Its dollar value) of all equipment used on the job from beginning to end. Between January 1 and June 30 it moved onto the job 35 pieces of land equipment and the dredge assembly. The two groups (additional land equipment and the dredge assembly) represented 24.54 percent of the dollar value of all equipment used on the job.

 This change order work represented more than ten percent of the volume of earth moving that was contained In the 29 percent performance of the Initial contract work.

 Finding 33 (a).

 Finding 33 (c).

 See footnote 41, finding 19 (c).

 As noted In footnote 45, finding 25 (c).

 No question was raised as to the sufficiency or accuracy of plaintiff’s books.

 The consulting engineer was permitted to testify at length.

 The testimony of the president of the corporation was excluded. By the time he was presented, counsel had made plain his Intention to rely on opinion evidence without supporting foundation.

 The consulting engineer delineated losses totaling $1,137,000. The president of the corporation was presented to establish additional losses in the amount of $533,000, resulting from “intangibles”. Plaintiff was thus asking the court to And losses totaling $1,070,000 on the basis of opinion evidence without any showing from the books kept by it in the regular course of business.

 The pattern has become all too familiar in the valuation cases, where opinion evidence is sometimes the only evidence available. The claimant seeks to establish a benchmark in the stratosphere. Defendant burrows down to bedrock (which is usually about as far as it can go). The trier of the facts is, of course, in a quandary. Even by the simplest route (which the parties seem always to assume he will take), the median between the two extremes is somewhere in the upper atmosphere.

 The primary purposes were flood control and the generation of electric power.

 Plaintiff Is an Iowa corporation founded on the experience and encompassing the organization of men of recognized competence in heavy construction, including the type of work required by the contract In suit.

 Severe weather at the dam site prevented work of substantial consequence during the months of December, January, and February.

 These terms describe the -work of diverting the flow of the river into a previously prepared channel and stopping (closing) the natural channel. There are always elements of hazard in carrying out these operations. Erom the time of diversion and closure until the closing structure reaches its full height, the earth-filled dam is subject to being topped by floods. Because of the hazardous nature of the operations, diversion and closure represent the most critical items of work in the building of a dam. Since the owner is responsible for the safety, of the residents of the lower river valley and is accountable to contractors working on the structure, careful and close control of diversion and closure by the owner are warranted and are reasonably to be anticipated by the contractors.

 One specific item of discussion was whether to use a dredge or other types of equipment in making the closure.

 This Committee is not otherwise identified in the evidence, except that it had no relation to potential bidders for Stage III.

 Plaintiff’s home office was and is in Sioux City, but this fact is coincidental. There is no evidence that plaintiff knew or reasonably should have known of the report by the District Engineer.

 One, possibly more, of the drawings had not been completed on March 15, 1950. No issue is presented here by this fact.

 The changes in completion dates are listed in finding 45.

 Both of these men had some inkling of the deliberations in the Omaha Office relating to postponement. The inference is, that because of these inklings, the mere presence of the 1952 date was enough to convey to them the meaning that the postponement had been ordered, and that the 1952 closing was mandatory. Shortly after receipt of the official specifications, defendant’s Resident Engineer remarked to plaintiff’s Resident Engineer: “It looks like a 1952 closing.” Plaintiff's Resident Engineer, lacking the background information possessed by defendant’s Resident Engineer, did not understand the remark to mean that 1952 diversion and closure would be required to the exclusion of completion in 1951.

 As applied to a potential bidder other than plaintiff, because of the expense of rapid mobilization.

 This exchange of correspondence between the Area Engineer and the District Engineer set the tone for subsequent exchanges between them; and the correspondence between these two officials affected the discussions between them and plaintiff’s representatives. From the tone and content of the correspondence and discussions, plaintiff inferred (in July 1950) and has urged here that defendant’s insistence upon 1952 diversion and closure was the result of considerations extraneous to the written contract.

 Considerations by the Omaha Office of “the Improved construction period for spillway and power house,” to which the District Engineer’s memorandum refers, were apparently unknown to the Area Engineer prior to receipt by him of the District Engineer’s advice. Such considerations were not made known to plaintiff, nor were they apparent from the wording of the Stage III specifications.

 Neither the Area Engineer nor any other subordinate of the District Engineer in the field had contracting authority. Plaintiff’s representatives must be deemed to have known that contracting authority in behalf of defendant resided in the District Office only. The Area and Resident Engineers were nevertheless the representatives of the District Office on the site. Plaintiff was warranted in assuming that their information was accurate.

 Whether or not it should have occurred to him, and whether or not he should have sought confirmation, are matters that go to the reasonableness of plaintiff’s action in relying on the interpretation placed on the contract by the Project Manager.

 Plaintiff thought the option (as It read the contract) to close In 1951 gave It an advantage. Defendant thought plaintiff’s presence on the site (mobilization) gave it an advantage, even for closing In 1952.

 The major item of equipment to be acquired was the dredge.

 Plaintiff’s bid was $759,304 below tbe next lowest bid. Tie next-to-the-lowest bid was $482,815 below tie next-to-tie-higiest, and tie latter was $796,680 below tie highest bid.

 The Omaha Office had an impressive record for accuracy in its estimates of cost during the time when this estimate was made.

 The difference between this figure and the amount bid by plaintiff is $354,047.

 Plaintiff’s Project Manager considered it unlikely that any other contractor would bid the job on the basis of two-season performance because of the expense of mobilization. Defendant’s Area Engineer, however, found some evidence of preference for a two-season job on the part of potential bidders. See finding 8 (b). The evidence as a whole warrants the following inferences: (1) that some of the bids (other than plaintiff’s) were based on three seasons of work; (2) that all of the bids (other than plaintiff’s) were probably based on three-season work; and (3) that one or more bids (other than plaintiff’s) may have been based on two-season work.

 Such limitations were permitted by the invitation for bids. See finding 6 (b).

 This was true irrespective of the interpretations placed on the contract (two seasons or three) either by plaintiff or any of its competitors.

 Plaintiff’s bid was submitted on a standard form, dated May 10, 1950, “in compliance with” the invitation, and acknowledged that “Addenda Nos. 1, 2, and 3 were received and considered” in its preparation.

 W. D. Contract, Form No. 2. Contract No. DA-25-066-eng-363. The contract is in evidence as plaintiff’s Exhibit No. 3, and is incorporated herein by reference.

 See finding 43 (a) for text of SC-1. The final completion date stated therein was March 1, 1953.

 Some facts contained in succeeding findings, under the division heading of “Performance”, have been considered in arriving at the conclusions stated in this finding.

 Left and right are determined facing downstream.

 Part of the right bank abutment was reserved for the Stage IV contract.

 Paragraph SC-22a.

 Paragraphs GC-5a and SC-23. For text see findings 42 (b) and 43 (g)..

 Upon receipt of plaintiff’s plan of operations the District Engineer, in disapproving it, similarly assumed that it was submitted as a request for modification of the contract.

 On May 27, 1950 (11 days after the contract was signed), plaintiff’s executive vice president wrote the District Engineer as follows: “Reference is made to the completion dates specified in Paragraph SC-1 * * * for the * * * various phases of the work. The completion date for the last major phase of the work, * * * is November 20, 1952 and! the final completion date is March 1, 1953. It will be rather difficult to accomplish any work from November, 1952 to March 1953 due to winter conditions. This will make it necessary for us to complete all of the work by the latter part of November, 1952. Inasmuch as it will be necessary for us to complete all work by November, 1952, we would like to have our records show that it will be possible to obtain final acceptance and close out the contract in that year. * * * will the * * * Corps of Engineers give us final acceptance of the work on November 20, 1952 in lieu of the final completion date of March 1, 1953 * * * providing that all work under our contract is 100% completed and acceptable to you on that date, November 20,1952?"
On the basis of this letter (which is unexplained by plaintiff’s evidence, although the author of the letter was in the court room when the exhibit was offered) and on the basis of other bits and pieces of evidence deemed by defendant to be comparable, defendant has requested a finding that “plaintiff knew that defendant interpreted the contract to require a 1952 diversion and closure.” Such a finding is not warranted by the evidence as a' whole.

 Since other plans of operation were subsequently submitted by plaintiff, the initial one is identified in the evidence and is sometimes hereinafter referred to as the first-filed plan of operations (or progress schedule).

 The contract required work to be begun within 39 days after receipt of notice to proceed.

 The evidence does not disclose how much of this equipment represented holdover from the Stage II performance and how much had been added to such holdover by way of completing mobilization for the 1950 work on Stage III.

 Eor the purpose of computing equipment ownership expense plaintiff listed (on its Exhibit 34) the “cost or value” of each piece of equipment, derived *351 from the mean of the “cost, new, date first acquired, and cost, new, date on job.” These valuations did not purport to represent figures from plaintiff's boobs. They have been used here and in subsequent findings for the limited purpose of establishing percentages.

 On Its Exhibit 34 plaintiff listed 384 pieces of equipment having a total value (according to the methods used by it) of approximately $8.5 million. This over-all figure included a dredge (with barge and tug) valued at approximately $1.5 million. The so-called “land equipment” was therefore valued at approximately $7 million.

 Plaintiff has emphasized the Area Engineer’s statement that the proposed schedule was “incompatible” with other schedules as tending to show that “incompatibility” was the real reason for defendant’s 1952 requirement. Plaintiff accordingly contends that the contracting officer’s decision was based on afterthought. Such a conclusion is not warranted by the evidence. The record does not support the imputation of bad faith to either of the parties.

 The only evidence in the record concerning the “personal discussion” between the District Engineer and plaintiff concerning the contracting officer’s findings of fact is contained in the District Engineer’s letter of August 80, 1950 (subdivision (a) of this finding) and in plaintiff’s response to the findings of fact.

 In this response to the contracting officer’s findings of fact plaintiff incorporated an outline of its theory of the case, vie, that the contracting officer’s decision of July 6, 1950, constituted either a change in the specifications under Article 3 or a suspension of the work under paragraph GC — 11 of the specifications, in either of which events the contractor was entitled by the terms of the contract to an equitable adjustment in the contract price.

 Finding 15.

 When plaintiff received the contracting officer’s decision of July 6, 1950, at least two pieces of heavy land equipment which were to be coordinated with the dredge had not been brought to the site, although arrangements had been made to have them available. As a result of plaintiff’s subsequent modification of its plans because of defendant’s 1952 requirement, these two pieces of land equipment were never brought to the site. The dredge was used to perform the work instead.

 The letter bore the date “May I960.” No day was given.

 The evolution of plaintiff’s theory of the case (which assumes Importance In Its development of the issue of damages) Is evident from this correspondence, in which reference to changes in the specifications under Article 3 has been dropped and emphasis applied to suspension of the work under GC-11.

 This equipment represented 46.16 percent of the value of all of the land equipment used on the job from beginning to end.

 Representing 7.58 percent of the value of all equipment used.

 Representing 17.13 percent of the value of all equipment used.

 Representing 41.38 percent of the value of all land equipment used.

 Within broad limits plaintiff was free to assign as much or as little of the land equipment as it chose to the performance of the contract work in 1951, and to put the equipment not so assigned to such other use as might be available.

 Plaintiff knew or reasonably should have known that completion of the administrative procedures (protest and appeal of the contracting officer's decision) could not be anticipated in time for adjustment by it to the situation resulting from the contracting officer’s decision. Moreover, plaintiff pursued the administrative procedures only as a matter of precaution, contending from the outset that the issue was one of law (interpretation of the contract) and not of fact.

 If the contracting officer -would not accept plaintiff's interpretation of the contract, he nevertheless had authority to permit 1951 diversion and closure by change order.

 The schedule and plan for diversion and closure of the river remained virtually unchanged from, the schedule reflected by plaintiff’s first-filed plan of operations, except that it was begun on July 1, 1952, instead of July 1, 1951.

 If plaintiff moved the additional 1,150,890 cubic yards of earth with equipment brought to the site solely for the performance of the initial Stage III contract, the inference follows, as defendant contends, that plaintiff had on the job more equipment than was needed. If plaintiff increased its stock of equipment in order to perform the extra work, the additional equipment would not be chargeable as costs fairly and reasonably incurred in the performance of the initial Stage III contract.

 The quotation is from the opening sentence of the Board’s decision.

 The issue of liability hinges on the legal effect of defendant's action. If the 1952 requirement was, in law, a change in the specifications, and if, in conforming to the changes so ordered, plaintiff incurred (fairly and reasonably) costs which it would not otherwise have incurred, the contracting officer’s failure and refusal to make an equitable adjustment in the contract price as required by Article 3 constituted a breach of the contract.

 Paragraph GC-11 of the specifications (finding 42) provided an equitable adjustment for a suspension of the work for the convenience of the Government, to cover expense or loss caused thereby.

 The contracting officer expressed willingness to mate an equitable adjustment as for a change in the specifications relating to the plugs.

 Such a suspension would have entailed, by implication and as a reasonable measure for the mitigation of loss, the removal of virtually all of the equipment at the end of the 1950 season for use elsewhere during 1951, and the remobilization of equipment at the site of the contract work for use during 1952. Conceivably, this couldi have been done. The ability of any contractor to manage such a one-yeár interval in an adjustment of such magnitude with substantial economies over the course followed by plaintiff in this instance is questionable.

 This finding represents a conclusion based, on and warranted by the evidence as a whole. The costs of performance are not in evidence: neither the actual costs as-performed, nor the costs fairly and reasonably incurred as-performed, nor the costs that would have been incurred (as estimated, or as fairly and reasonably tp bp anticipated) if the work had been performed as bid.

 Plaintiff presented Its evidence of damages in terms of elements of increased costs, some of which, notably equipment ownership expense and overhead (field and home office), were measured by a one-year “standby period” extending from July 1, 1951, to June 39, 1952. Plaintiff contends that the work was “suspended” andi that plaintiff was “delayed” during this period. The “standby period” device was convenient and, in terms of plaintiff's theory of the case, plausible. In the light of the findings made herein, the utility of the device is questionable.

 Inherent in plaintiff’s evidence relating to damages is the thesis that the several elements of increased costs represént the parts which comprise the difference between the costs as-performed and the costs as-bid; that the sum of the elements represents the total of the difference in costs. As related! to the occurrence of loss (cause and effect) the thesis is sound. As related to the amounts of the losses, the thesis fails, primarily because plaintiff asks the court to assume, without adequate substantiating evidence, that the costs (as presented by plaintiff, without reference to its books and records) (1) were incurred and (2) were fairly and reasonably incurred.

 Plaintiff’s election to treat its claim for plug removals as part of its larger claim for equitable adjustment was reasonable under the circumstances. Defendant bas made no point of plaintiff’s failure to seek administrative relief separately.

 Plaintiff claims there were four extra moves instead of three. The extra moves were occasioned by the fact that, during 1951, plaintiff, in an effort to keep the dredge busy (and thereby avoiding idle time in mitigation of damages), excavated the approach and discharge channels. The plugs could have been removed in the process. When, in 1952, plaintiff was permitted to remove the plugs, the dredge had to be moved (1) to the discharge channel; (2) from there around to the approach channel; and (3) from there to the next point of use.

 Plaintiff has listed, as costs attributable to these increases, figures which total 530,657, representing “increased cost of labor, $13,757.81, increased cost of insurance, $1,238.20, and increased cost of fuel, oil, and grease, $15,661.73.” Plaintiff may have eliminated from these costs the portions attributable to the work of Change Order 4. Such evidence as there is, however, points to the contrary. The determination is therefore warranted that plaintiff’s loss from these increased costs was somewhat less than the amount claimed.

 Plaintiff presented the president of the corporation to testify as an expert, giving opinion evidence as to the amounts attributable to these elements. Opinion evidence was offered on the ground that the items were losses of an “intangible” nature. The evidence was excluded on objection by defense counsel. The reason for the exclusion was lack of foundation, since there had been no showing that the losses could not be proved (whether specifically identifiable or not) by the corporation’s books and records. The witness was permitted to answer questions on direct and cross-examination in lieu of an offer of proof. Had he been permitted to testify, he would have testified that plaintiff’s loss through the “intangibles” to which he addressed himself was “around $533,000” of which the amount of $278,000 was attributable to the extra costs described in the paragraph to which this note is appended, the balance being attributable to “overrun overhead,” an element not established by the evidence.

 As to the extent of (1), see findings 27 (i) and 32 (b). As to the extent of (2), the evidence relating to some of these replacements was unconvincing.

 This finding is not predicated on specific evidence because of the nature of the evidence presented.
Plaintiff employed a qualified consulting engineer to prepare and present the claims developed in this suit (with the exception of the claim for plug removal, described in finding 36, and the claims for “intangibles”, described in finding 37 (c) and footnote 65). The engineer was directed to use his own good judgment in identifying and developing the elements of claim, without instructions by plaintiff or guidance by plaintiff’s counsel. It was he who devised the “standby period” (finding 34 (c) and footnote 61).
Counsel for plaintiff presented the engineer’s results as reflecting (1) the increased costs incurred by plaintiff and (2) the equitable adjustment which should have been made by the contracting officer under paragraph GC-11 of the specifications because of his “suspension of the work for the convenience of the Government.”
The engineer’s claims for equipment ownership expense and for overhead were not based upon plaintiff’s books and records.

 Plaintiff’s home office overhead costs were approximately 4.5 percent of gross contract revenues during the period of the performance of the contract in suit. No percentage figure is established by the evidence for field overhead expense (described in plaintiff’s claim as “indirect expense”).

 No percentage figure of profits realized from plaintiff’s experience was suggested by the evidence. The posture of the case is such, however, that the application of the standard formula (adding ten percent for overhead and profit) would be warranted, if (1) the evidence made possible a determination of (a) the difference in the costs as-performed and as-bid, as described in finding 33 (a), or (b) the various elements of increased costs, as listed in finding 35, and (2) the plaintiff is entitled as a matter of law to recover.

 Serial No. CIVENG-25-066-50-140 (Eort Randall Reservoir). The specifications are in evidence as plaintiff’s Exhibit No. 4, and are incorporated herein by reference.

 Three Addenda were Issued after March 15 and prior to May 10, 1950. The excerpts recited reflect the changes made by the Addenda.

 Addendum No. 1 made some changes in the text of GC-3, among which was the deletion at the end of the words “and the Government will not be liable or responsible therefor”.

 Some changes were made In SC-1 by Addendum No. 1, notably tbe reference to subparagraph l-09c, and tbe insertion of elevations relating to embankments.

 Details of the Government Plan for Diversion were set forth in paragraph 5-05

 The differences are listed In defendant’s Exhibit No. 7, which is incorporated herein by reference.